OPINION
{¶ 1} Plaintiffs-appellants William and Virginia Huffman (the Huffmans) appeal the Columbiana County Common Pleas Court's grant of summary judgment for defendants-appellees Columbiana County Board of Commissioners, James Hoppel as Columbiana County Commissioner, Sean Logan as Columbiana County Commissioner, and Gary Williams as Columbiana County Commissioner (collectively referred to as "the county"). Two issues are raised in this appeal. The first issue is whether governmental immunity as defined under R.C. 2744.01, 2744.02 and 2744.03 is applicable as to the county for failing to place barricades in front of a bridge on Winona Road that had fallen during the horrific rainstorms on August 27 and 28 of 2004. The second issue is whether the county, specifically the Columbiana County Engineer's Department and Paul Parks, Superintendent of the County Engineer Department, acted recklessly, willfully and/or wantonly in failing to place barricades in front of the fallen Winona Road bridge. For the reasons stated below, the judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings.
 JOINT STATEMENT OF THE CASE AND FACTS {¶ 2} On August 28, 2004, at approximately 6:30 a.m. William Huffman was in a one-car accident. William was traversing Winona Road in his car and attempted to cross the bridge located on that road. He was unable to do so because the rainstorm that occurred during the late hours of August 27, 2004, and during the early hours of August 28, 2004, caused major flooding which led to the collapse of the Winona Road bridge. William ran his car into the void left by the fallen bridge and sustained serious injuries.
 {¶ 3} The Winona Road bridge is located in Columbiana County outside the Village of Lisbon. It is located 0.3 of a mile west of the intersection of Winona and Depot Roads. It is undisputed that it is Columbiana County's responsibility to maintain this bridge. Furthermore, it is undisputed that prior to the rainstorm the bridge was structurally sound.
 {¶ 4} The rainstorm that caused damage to the Winona Road bridge began during the late hours of August 27, 2004. The rain continued to fall until the early morning hours of August 28, 2004. It is undisputed that this rainstorm caused serious flooding and damage in and around the Village of Lisbon, Columbiana County, Ohio. Numerous deponents indicated that this was the worst rainstorm that they could remember in the history of Columbiana County. (Bret Dawson (County Engineer) Depo. 32 (worst magnitude disaster he has had to deal with); James Hoppel (County Commissioner) Depo. 44; Detective Sergeant Steven Walker Depo. 27 (never seen flooding like this); Deputy Manuel Milbauer Depo. 27 (lived in county all of his life and "never seen a rainstorm like this one"); Ronald Buchanan (works for highway department) Depo. 37, 56 ("never see nothing like I seen that night").
 {¶ 5} During this storm, at 2:27 a.m., a Winona Fire Department fireman discovered that the bridge had dropped approximately six inches and that the bridge was impassable. Willie Brantingham (Fire Chief for the Winona Volunteer Fire Department) Affidavit ¶ 6. This information was subsequently relayed to the Columbiana County Sherriff's Dispatcher Casey Wilson. Brantingham Affidavit ¶ 6; Wilson Affidavit ¶ 5; Wilson Depo. 40-41, 43. Wilson then immediately notified Paul Parks, Superintendent for the Columbiana County Engineer's Department, who oversees the day-to-day operations of highway maintenance. Wilson Affidavit ¶ 5; Wilson Depo. 41; Parks Depo. 33-34. It is undisputed that Parks' department was in charge of placing barricades and closing the bridge at Winona Road.
 {¶ 6} At approximately 2:30 a.m. when Parks had received the notification that the Winona Road bridge was starting to fall, he was already attempting to deal with issues that were being caused from the torrential downpours of rain. At approximately 10:30 p.m. on August 27, Parks received a phone call at home. Parks Depo. 9. This call informed him that the rain was causing flooding on Teegarden Road. Id. Parks called Ronald Buchanan, one of his employees, to address the problem. Id. at 11; Buchanan Depo. 15. Buchanan proceeded to try to address the problem.
 {¶ 7} Around 11:00 p.m., Parks received additional calls about flooding in different areas. Parks Depo. 13-14. Shortly thereafter at around 11:30 p.m., Parks decided that due to this rain and the calls concerning flooding, he should go to the county garage immediately. Id. at 15. Due to the flooding and the inability to navigate over many of the roads, Parks did not arrive at the county garage until 2:00 a.m. Id. Thus, it took him approximately 2½ hours to travel from his house in East Palestine to the county garage in Lisbon. Id. During this time, he attempted to call additional employees into work. Id. He got a hold of Mike Zook and Tim Wood. Id. at 23.
 {¶ 8} At 1:00 a.m., Parks received a phone call from Buchanan. Buchanan informed Parks that in attempting to address the problem at Teegarden Road he got stranded and would be unable to return to Lisbon until the waters receded. Buchanan Depo. 43. Buchanan was near Lincoln Storage and all of the roads near it leading in other directions were flooded. He (and some other motorists) was unable to go very far in any direction. Buchanan Depo. 38.
 {¶ 9} When Parks arrived at the garage, Zook and Wood had already arrived. Parks Depo. 24. Parks also noticed that the garage had begun to flood. Parks, Zook and Wood then removed one of the trucks from the garage. Id. at 24. That was all that could be removed due to the flooding. Id. at 24. Ultimately, the lower level of the garage completely flooded and the upper portion had about 3 inches of water in it. Id. at 26.
 {¶ 10} After seeing the garage and all the flooding that was occurring on the roads, Parks, Zook and Wood proceeded to the Emergency Management Agency (EMA) office. Id. at 29. At the EMA office, Parks met with Jay Carter, Director of Emergency Management. Parks wanted to see what was going on in the county and if it had been declared a state of emergency. Id. at 31.
 {¶ 11} After Parks found out the county was in a state of emergency, he, Zook and Wood left the EMA office and proceeded back to the garage. This occurred around 2:30 a.m. Around this time, Parks received the call from Wilson about the Winona Road bridge starting to fall. Id. at 31-34. Parks, Zook and Wood arrived back at the garage around 3:00 a.m. Buchanan also arrived back at the garage at this time. Id. at 36. Buchanan's truck had some signs and barricades in it. Id. at 37. The water continued to rise at the garage. The men could not get into the garage because the electric was going off and on and the garage flooding created a safety hazard.
 {¶ 12} Parks, Zook, Wood, and Buchanan stayed at the garage in the parking lot. They did not physically attempt to go to the Winona Road bridge. Parks did not call anyone from the Sheriff's Department or from the Fire Department to inform them that he was unable to check on the status of the Winona Road bridge. Parks began to call additional workers to the garage at 5:30 a.m. He waited until this time because he was concerned about employee safety traveling on the roads. Id. at 38. At 5:30 a.m., the water had already receded and it was daylight.
 {¶ 13} After additional employees arrived at the garage, trucks were loaded and sent out to address the problems caused by the flooding. The workers left the garage around 6:30 a.m. and did not arrive at the Winona Road bridge until approximately 7:30 a.m., which was approximately one hour after William's accident had occurred. Id. at 44. This was approximately 5 hours after Parks was notified that the Winona Road bridge was starting to fall.
 {¶ 14} Due to the injuries and the length of time it took the county to respond to the notification that the bridge was starting to fall, the Huffmans filed suit against the county on December 10, 2004. The county answered and asserted immunity as specified under Chapter 2744 of the Revised Code as a defense.
 {¶ 15} Numerous depositions were then taken and each party filed a motion for summary judgment. The Huffmans asserted that immunity was not available to the county because a fallen bridge is an obstruction and the county is liable for failing to keep the road free from obstructions pursuant to R.C. 2744.02(B)(3). They argued that the county could have removed the obstruction by barricading the bridge. They also argued that Parks acted wantonly or recklessly by failing to attempt to barricade the bridge and/or by failing to notify anyone that his staff could not go out to the bridge. The county contended that the road itself cannot be considered an obstruction. Furthermore, it argued that even if it is an obstruction, it did not negligently fail to remove the obstruction. It additionally argued that the duty to erect signs and barricades are discretionary functions and, as such, immunity attaches to discretionary functions. It further argued that Parks did not act wantonly or recklessly.
 {¶ 16} After considering these arguments, the trial court issued its decision. It stated that a fallen bridge is an obstruction which the county had a duty to remove. It explained:
 {¶ 17} "While the county can protest this fallen bridge is not `an obstruction' because it is not a big boulder sitting in the road there is no doubt that this fallen bridge `created a danger for ordinary traffic on the regularly traveled portion of the road.' The Court can think of no bigger obstruction to travel than a fallen bridge." 11/25/05 J.E.
 {¶ 18} Thus, the court found that while the county could not have feasibly repaired the road within that amount of time, the obstruction could have been removed by the use of barricades. The trial court then went on to discuss the erection of signs. It found that in accordance with Franks v. Lopez (1994),69 Ohio St.3d 345, the erection of signs is a discretionary decision. Also, by citing Schaffer v. Board of Cty. Commrs. of CarrollCty., Ohio (Dec. 7, 1998), 7th Dist. No. 672, it explained that this court has found that there is no distinction between the discretionary nature of erecting permanent signs and erecting temporary signage. The trial court explained:
 {¶ 19} "If it is assumed that Parks was negligent in failing to place signs to remove this obstruction the failure to erect the temporary signs is subject to the defense of immunity under R.C. 2744.03(A)(5) and the county is not liable." 11/25/05 J.E.
 {¶ 20} The court then went on to find that there was no showing that Parks acted wantonly or recklessly. The Huffmans appeal from that decision raising two assignments of error.
 FIRST ASSIGNMENT OF ERROR {¶ 21} "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF APPELLEE-DEFENDANT BY DETERMINING THAT THE DEFENSES SET FORTH IN R.C. 2744.03 ARE APPLICABLE HERE."
 {¶ 22} "The determination as to whether a political subdivision is immune from suit is purely a question of law properly determined by a court prior to trial and preferably on a motion for summary judgment." Schaffer v. Board of Cty. Commrs.of Carroll Cty., Ohio (Dec. 7, 1998), 7th Dist. No. 672, citingConely v. Shearer, 64 Ohio St.3d 284, 292, 1992-Ohio-133. An appellate court reviews a trial court's decision on a motion for summary judgment de novo. Bonacorsi v. Wheeling Lake Erie Ry.Co., 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24. Summary judgment is properly granted when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. Harless v. WillisDay Warehousing Co. (1978), 54 Ohio St.2d 64, 66; Civ.R. 56(C).
 {¶ 23} R.C. Chapter 2744 addresses governmental immunity. It provides a three-tiered analysis for determining the availability of sovereign immunity to political subdivisions. R.C.2744.02(A)(1) states that political subdivisions are generally not liable for injury, death or loss to persons or property incurred in connection with the performance of a governmental or proprietary function of that political subdivision. However, subsection B lists five exceptions to this general immunity. These exceptions are as follows:
 {¶ 24} "(B) Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:
 {¶ 25} "(1) Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority. The following are full defenses to that liability:
 {¶ 26} "(a) A member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct;
 {¶ 27} "(b) A member of a municipal corporation fire department or any other firefighting agency was operating a motor vehicle while engaged in duty at a fire, proceeding toward a place where a fire is in progress or is believed to be in progress, or answering any other emergency alarm and the operation of the vehicle did not constitute willful or wanton misconduct;
 {¶ 28} "(c) A member of an emergency medical service owned or operated by a political subdivision was operating a motor vehicle while responding to or completing a call for emergency medical care or treatment, the member was holding a valid commercial driver's license issued pursuant to Chapter 4506. or a driver's license issued pursuant to Chapter 4507. of the Revised Code, the operation of the vehicle did not constitute willful or wanton misconduct, and the operation complies with the precautions of section 4511.03 of the Revised Code.
 {¶ 29} "(2) Except as otherwise provided in sections 3314.07
and 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.
 {¶ 30} "(3) Except as otherwise provided in section 3746.24
of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads, except that it is a full defense to that liability, when a bridge within a municipal corporation is involved, that the municipal corporation does not have the responsibility for maintaining or inspecting the bridge.
 {¶ 31} "(4) Except as otherwise provided in section 3746.24
of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code.
 {¶ 32} "(5) In addition to the circumstances described in divisions (B)(1) to (4) of this section, a political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code, including, but not limited to, sections 2743.02 and 5591.37 of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon a political subdivision, because that section provides for a criminal penalty, because of a general authorization in that section that a political subdivision may sue and be sued, or because that section uses the term "shall" in a provision pertaining to a political subdivision." R.C. 2744.02(B).
 {¶ 33} That said, if any one of the exceptions listed above is found to exist, this does not necessarily mean that the political subdivision in necessarily liable. R.C. 2744.03 lists additional defenses and/or immunities that may be asserted to establish nonliability. This statute states:
 {¶ 34} "(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:
 {¶ 35} "(1) The political subdivision is immune from liability if the employee involved was engaged in the performance of a judicial, quasi-judicial, prosecutorial, legislative, or quasi-legislative function.
 {¶ 36} "(2) The political subdivision is immune from liability if the conduct of the employee involved, other than negligent conduct, that gave rise to the claim of liability was required by law or authorized by law, or if the conduct of the employee involved that gave rise to the claim of liability was necessary or essential to the exercise of powers of the political subdivision or employee.
 {¶ 37} "(3) The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee.
 {¶ 38} "(4) The political subdivision is immune from liability if the action or failure to act by the political subdivision or employee involved that gave rise to the claim of liability resulted in injury or death to a person who had been convicted of or pleaded guilty to a criminal offense and who, at the time of the injury or death, was serving any portion of the person's sentence by performing community service work for or in the political subdivision whether pursuant to section 2951.02 of the Revised Code or otherwise, or resulted in injury or death to a child who was found to be a delinquent child and who, at the time of the injury or death, was performing community service or community work for or in a political subdivision in accordance with the order of a juvenile court entered pursuant to section2152.19 or 2152.20 of the Revised Code, and if, at the time of the person's or child's injury or death, the person or child was covered for purposes of Chapter 4123. of the Revised Code in connection with the community service or community work for or in the political subdivision.
 {¶ 39} "(5) The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.
 {¶ 40} "(6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:
 {¶ 41} "(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
 {¶ 42} "(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
 {¶ 43} "(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.
 {¶ 44} "(7) The political subdivision, and an employee who is a county prosecuting attorney, city director of law, village solicitor, or similar chief legal officer of a political subdivision, an assistant of any such person, or a judge of a court of this state is entitled to any defense or immunity available at common law or established by the Revised Code.
 {¶ 45} "(B) Any immunity or defense conferred upon, or referred to in connection with, an employee by division (A)(6) or (7) of this section does not affect or limit any liability of a political subdivision for an act or omission of the employee as provided in section 2744.02 of the Revised Code." R.C. 2744.03.
 {¶ 46} Given all the above, the first determination for sovereign immunity is whether repairing the bridge and/or removing the obstruction of the bridge is a governmental or propriety function. Clearly under R.C. 2744.01(C)(2)(e) the maintenance and repair of roads and bridges constitutes a governmental function. Therefore, the county is not liable unless one of the exceptions under R.C. 2744.02(B) applies (going to the second tier of the governmental immunity analysis).
 {¶ 47} The trial court held that subsection (B)(3) was applicable in the matter at hand. As aforementioned, this subsection states:
 {¶ 48} "Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads, except that it is a full defense to that liability, when a bridge within a municipal corporation is involved, that the municipal corporation does not have the responsibility for maintaining or inspecting the bridge."
 {¶ 49} Under this subsection, the trial court determined that the fallen bridge was an obstruction and thus, the county was liable if it negligently failed to remove the obstruction. The trial court then determined that the only way the county could remove the obstruction was by placing barricades in front of the bridge, i.e. signage. Therefore, following this reasoning, the trial court determined that the county was not negligent under (B)(3) because under R.C. 2744.03(A)(5) and the Ohio Supreme Court case Franks v. Lopez (1994), 69 Ohio St.3d 345, the erection of signage is discretionary. As it is a discretionary function, the trial court concluded that the failure to erect a sign or barricade is not actionable under the statute.
 {¶ 50} We agree with the trial court that R.C. 2744.02(A)(3) is applicable to the case at hand. Clearly, a collapsed bridge falls under a failure to keep public roads in repair or a failure to remove obstructions. The word obstruction is not defined by statute. Furthermore, there is no case law on what constitutes an obstruction. The current version of subsection (B)(3) was part of Senate Bill 106, which became effective in 2003. The prior version of R.C. 2744.02(B)(3) did not contain the word obstruction. Instead it read:
 {¶ 51} "Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by their failure to keep public roads, highways, streets, avenues, alleys, sidewalks, bridges, aqueducts, viaducts, or public grounds within the political subdivisions open, in repair, and free from nuisance, except that it is a full defense to that liability, when a bridge within a municipal corporation is involved, that the municipal corporation does not have the responsibility for maintaining or inspecting the bridge."
 {¶ 52} As can be seen by a comparison between the old statute and the new statute, the new statute removed the word nuisance and instead stated a "negligent failure to remove obstructions." Thus, since case law dealing with the old statute does not address what is an "obstruction" and case law dealing with the current statute has not yet determined this, there is little guidance as to what constitutes an "obstruction."
 {¶ 53} That said, the generic definition of obstruction is "something that obstructs." Webster's Tenth Collegiate Dictionary (1998) 803. Obstruct is defined as "to hinder from passage, action, or operation: impede." Id. As the trial court noted, there would be no bigger obstruction to travel than a fallen bridge. We agree. However, even if a collapsed bridge is not considered an obstruction, a bridge being collapsed would constitute a failure to keep a public road in repair.
 {¶ 54} Thus, our analysis turns to whether the county was negligent in its failure either to repair the road or to remove the obstruction. As stated above, the trial court found that the county did not act negligently because the only way to remove the obstruction was through the erection of signage and since erection of signs is discretionary, the county was not liable for the failure to erect signs.
 {¶ 55} We agree with the trial court that the only way the obstruction could be removed in this situation was through the erection of signage. That said, we do not agree with the final decision that there is no genuine issue of material fact as to whether the county negligently failed to remove the obstruction.
 {¶ 56} In Franks, the Ohio Supreme Court stated:
 {¶ 57} "Overhanging branches and foliage which obscure traffic signs, malfunctioning traffic signals, signs which have lost their capacity to reflect, or even physical impediments such as potholes, are easily discoverable, and the elimination of such hazards involves no discretion, policy-making or engineering judgment. The political subdivision has the responsibility to abate them and it will not be immune from liability for its failure to do so." Franks, 69 Ohio St.3d at 349.
 {¶ 58} The above quoted portion of Franks indicates that once signage is posted, there is a mandatory duty to maintain. As such, a political subdivision will be held accountable for failing to replace signs that have lost their capacity to reflect or failing to remove foliage that obscure traffic signs. Id. Thus, Franks is clear that the erection of signage is discretionary, however, the duty to maintain signage is mandatory. Id., citing Winwood v. Dayton (1988),37 Ohio St.3d 282.
 {¶ 59} However, as seen above, Franks goes further to state that impediments such as potholes that are easily discoverable, the elimination of the hazards involve no discretion, policy-making, or engineering judgment. A collapsed bridge falls under an easily discoverable hazard. As such, the decision of whether to barricade the bridge involves no discretion, policy-making or engineering judgment. The bridge must be barricaded. To hold otherwise would mean that a county would have no responsibility to ever barricade a fallen bridge.
 {¶ 60} Thus, we cannot find that the decision to barricade the bridge called for a discretionary decision. Thus, the question then is did the county act negligently in failing to remove the obstruction?
 {¶ 61} Negligence as defined legally is, "the omission to do something which a reasonable man, guided by those ordinary considerations which ordinarily regulate human affairs, would do." Black's Law Dictionary (5 Ed. 1979) 930.
 {¶ 62} The facts in this case show that clearly this was one of the worst rainstorms that Columbiana County experienced. It took Parks 2½ hours to go to work because of the flooding. Trying to come to the garage that night, Parks learned that Route 517 was completely flooded and he could not take that road into Lisbon. So he went a different direction and tried to go on Franklin Square. Parks Depo. 19. Franklin Square and 558 were completely flooded. Parks Depo. 19. A fireman was sitting at 558 indicating that Parks could not take that route because it was flooded. Id. at 19. Parks, knowing he needed to get to the garage, drove his truck through there anyway. Id. at 20. The water was so high it was hitting his "door coming up past [the] passenger window." Id. at 21. He then proceeded to turn left onto Canfield-Lisbon Road. There is a big hill on this road and he saw that the rain had washed tremendous amounts of debris, large rocks, and trees onto the road. Id. at 21-22. However, he still proceeded onto this road. At various points on this road where either it intersected with crossroads or where it was low lying, there was "heavy flooding." Id. at 22. After all this, Parks finally arrived at the garage, which was flooding and continued to flood throughout the night. Entering the garage was risky at that point because the electric was coming on and off.
 {¶ 63} Furthermore, from communicating with Buchanan, Parks was aware of other roads and areas which were experiencing severe flooding. In fact, as stated earlier, Buchanan became stranded at one point where he could not travel in any direction due to various roads being flooded in all directions. Buchanan's deposition testimony indicates how bad this storm was during the late hours of August 27 and the early hours of August 28. He explained:
 {¶ 64} "Just that. I just turned left on Teegarden, and I was awestruck at what I was seeing. The water, there was so much water coming off of the north side of the ski slope, the state has a big pipe, I am not sure of the precise size of the pipe, I would guess four foot plus in diameter, and it wasn't able to handle the water coming down out of that little wooded area off the north side of the ski slope, and it was hitting the area where the cross pipe is at under Teegarden, it was literally shooting up in the air and going over the guardrail splashing down onto the westbound lane at Teegarden and running down the road.
 {¶ 65} "And I'm trying to picture is this actually what I'm seeing, and it was. I thought, well, the road still looks intact. So I thought I better proceed on.
 {¶ 66} "That was pretty bad. I was kind of leery to drive through it because it looked pretty deep but I did, and I proceeded west and I got maybe two-tenths of a mile and there was another scenario pretty much of what I seen only worse."
 {¶ 67} "Q. Is there another pipe, culvert?
 {¶ 68} "A. Yes. It was our cross pipe, county cross pipe, which is smaller, I'm going to say probably a 24-inch pipe, but to the right of that location, that cross pipe, there is a resident there, a man has a home built up in this hollow there. It is a ravine more or less, so to speak, and he had two ponds up there, and I am seeing just a massive amount of water coming down out of there, and I could see where it is starting to take the eastbound lane out, and there's just this gigantic hole, but there is so much water, I could see it coming off and running down the edge of our road.
 {¶ 69} "At that time it probably had already taken two feet of our roadway, and I thought there is no way I can put a barricade right there because it's just going to get washed away. So I got turned around.
 {¶ 70} "* * *
 {¶ 71} "There is no way I could drive through it. The water was just, I mean, I'm afraid to guess how deep it was. It was two feet plus, probably so much water coming through.
 {¶ 72} "Like I say, it was hitting our road, the road bank where our cross pipe was at and coming up, again, the same kind of scenario of what I had previously seen at the other intersection, coming up and coming down and hitting the road so hard it pounded a hold in the road, the eastbound lane, washing it away.
 {¶ 73} "So I thought I need to get through there. So I can't, so I opted to come back and the rain had picked up, again, even worse, if you can imagine from worse to even worse." Buchanan Depo. 26-29.
 {¶ 74} Also, deposition testimony from various Sherriff's Deputies indicates that many roads were impassable that night. Sergeant Thomas Smith indicated that Route 45 was shut down and he could not go any further than Logtown Road. Smith Depo. 17-19. It was dispatched to him that Route 45 washed away at Salem Grange Road and McCracken Road. Id. at 18-19. Other routes were also impassable throughout the night. Id. at 28. Route 9 was impassable, parts of Route 172 in the Guilford Lake area were impassable, and at one point Route 11 at Route 154 was shut down. Id. at 28. When asked about how far north he could travel, he indicated: {¶ 75} "We could not get any further north than Teegarden Road and Depot Road. We could not get any further than coming across the county roads that I know were shut down.
 {¶ 76} "Depot, 172 was shut down just west of Guilford Lake. Lisbon, it was shut down at 45 just south of Logtown-Saint Jacobs, and then even further up where the bridge was washed out, 164 North, we were not able to get any further in that direction, and not speaking from personal knowledge, but patrol advised that State Route 11 was closed north of Lisbon." Id. at 62.
 {¶ 77} Deputy Manuel Milbauer conveyed similar information. He indicated that there was flooding on Depot Road. Milbauer Depo. 13. There were problems at McCracken Corner but he could not make it that far. Id. He indicated that in trying to get there he was stopped at Depot Road because just north of Teegarden Road there was water across Depot Road. Id. at 14. He explained that Teegarden Road to the east was under water. Id. At one point in his deposition he references a conversation he had with a Winona fireman at Winona Road west. Id. at 20. When asked about the conversation, he stated the following:
 {¶ 78} "He told me that Winona was not passable to the west, that Depot was flooded to the north of him, the bridge was out at McCracken [a different bridge than the one at issue in this case], and I said is there any way out of here, and he said well, you can try to go Winona east, but Teegarden is washed out down at McCracken Road.
 {¶ 79} "So the whole area was basically flooded. Winona Road to the east was underwater where I could see from Depot. Winona to the west back behind the truck was under water." Id. 20-21.
 {¶ 80} This conversation occurred around midnight. Milbauer tried to continue north on Depot Road, but did not make it more than a quarter of a mile because the bridge on Depot Road was totally under water. Id. at 21. Milbauer indicated that he could not even see the bridge because the water had risen over the guardrails. Id. Thus, for awhile, Milbauer was stranded and unable to travel in any direction. At around 3:00 a.m. the rain had let up a little bit and the water had receded slightly at Winona Road east. Id. at 27. He took Winona Road east to Yates Road then to Campbell Road and then to 172. Id. at 27-28. He indicated that he was able to travel these roads but there was still several inches of water on the roads.
 {¶ 81} The record indicates that between the time Parks found out about the bridge and the time that the accident occurred was a little over four hours. Parks did not notify the Sherriff's Department or anyone else that he would not be going out to the bridge until the morning. Deposition testimony revealed that several deputies were in the vicinity of the bridge that morning. Various deputies indicated that if they had been informed of the bridge, they would have attempted to blockade it. Whether or not they could have reached the bridge is debatable, but it is clear that no attempt was made to notify any of the deputies about the bridge's condition. Testimony also revealed that at around 3:00 a.m., the flood water was receding in certain areas of the county.
 {¶ 82} Considering all of the above, we find that it is a factual question for the jury as to whether the county was negligent. While this court and the trial court may believe that given the information Parks had that night he acted as a reasonable person would, the determination of what a reasonable person would do is typically a question for the jury. Accordingly, this assignment of error has merit.
 SECOND ASSIGNMENT OF ERROR {¶ 83} "THE TRIAL COURT ERRED IN DETERMINING THAT PAUL PARKS' CONDUCT WAS NOT WANTON OR RECKLESS AS A MATTER OF LAW."
 {¶ 84} The Huffmans contend that the County Engineer's Department, specifically Parks, acted wantonly or recklessly and did nothing to close the bridge or warn motorists of the hazard. After reviewing the depositions and summary judgment motions, the trial court found that Parks was not negligent, since negligence is a lower standard than recklessness and wantonness, summary judgment was granted for the county. In coming to this determination, the court stated:
 {¶ 85} "This is where the Court believes that the question of whether the acts or omissions of Parks in not erecting barricades gives rise to liability at all under the immunity statutes such that the question of defense and immunities is not reached. His decision not to risk people on the road that night cannot be said to be in violation of any duty of care. While it is true that sheriff's deputies and firemen were responding throughout the county to emergency situations, these are trained emergency personnel whose general duties include facing some danger. Parks' experience in attempting to get to the garage from East Palestine, the fact that he had already had one employee trapped for over two hours because of the storm, the fact that he had other employees with difficulty getting to the garage and the fact that his equipment was flooded all indicate that his decision not to send anyone else in harms way for any reason was reasonable under the circumstances." 11/25/05 J.E.
 {¶ 86} In order to survive summary judgment, the Huffmans were required to show that Parks' conduct fell within the definition of reckless, willful, and wanton.
 {¶ 87} "`Willful and wanton misconduct' constitutes more than mere negligence. Brockman v. Bell (1992), 78 Ohio App.3d 508. It is behavior which demonstrates `a deliberate or reckless disregard for the safety of others.' Reynolds v. City ofOakwood (1987), 38 Ohio App.3d 125, 127." Mitchell v. NorwalkArea Health Serv., 6th Dist. No. H-05-002, 2005-Ohio-5261, ¶ 57.
 {¶ 88} "[M]ere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor." Roszman v. Sammett
(1971), 26 Ohio St.2d 94, 96-97. Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury. Id. at 97. Such risk is substantially greater than that which is necessary to make his conduct negligent. Fisher v. Harden, 5th Dist. No. 2004AP0015,2005-Ohio-4965, ¶ 26.
 {¶ 89} Despite the fact that this court has found that there is an issue as to whether or not the county acted negligently in this case, we cannot find, given the facts, that Parks acted recklessly, wantonly, or willfully.
 {¶ 90} At most, Parks was negligent, but nothing in the record indicates his conduct rose to any higher level of culpability. In order for the finding of negligence to be converted into wanton misconduct, Parks must have known that his conduct would in all likelihood cause injury. Despite the Huffmans' characterization of Parks' actions as "doing nothing" and watching the water go by, the depositions reveal that this was not the case. Parks went to the garage, he called employees in, he went to the EMA office, and he continually took calls from the dispatcher. Considering the amount of time it took him and his employees to get to the garage, the condition the garage was in when they arrived, and the condition of the roads, Parks' actions do not rise to the level of wanton, willful or reckless conduct. The conditions of the roads that night and the information Parks had before him do not support a determination that Parks acted wantonly, willfully, or recklessly. Consequently, this assignment of error lacks merit.
 {¶ 91} For the foregoing reasons, the judgment of the trial court is hereby affirmed in part, reversed in part and remanded to the trial court for further proceedings according to law and consistent with this Court's opinion.
Donofrio, P.J., concurs.
DeGenaro, J., concurs.