OPINION
{¶ 1} This matter is before the Court on the March 30, 2006, Notice of Appeal of Jackie Brown, individually and as administrator of the estate of Davionte Pierce, her son. Brown appeals the grant of summary judgment in favor of Appellee City of Dayton, on February 28, 2006.
 {¶ 2} The events giving rise to this matter began on July 3, 1999, when six year old Davionte and his eight year old brother entered the swimming pool area of Westwood Park, located in the City of Dayton, after the pool closed for the day. Shortly thereafter, Davionte's godfather pulled Davionte from the water unconscious, administered CPR, and summoned help. Paramedics took Davionte to Good Samaritan Hospital, and he was subsequently transferred to Children's Medical Center. Tragically, Davionte never regained consciousness, dying on July 14, 1999. Brown filed her Complaint on December17, 2004, alleging that the pool's perimeter fence needed repair and constituted a nuisance.
 {¶ 3} Brown asserts a single assignment of error as follows:
 {¶ 4} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN GRANTING APPELLEE CITY OF DAYTON'S MOTION FOR SUMMARY JUDGMENT."
 {¶ 5} "An appellate court reviews an award of summary judgment de novo. (Internal citations omitted). We apply the same standard as the trial court, viewing the facts in the case in a light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party."(Internal citations omitted.) Doe v. Choices, Inc., Montgomery App. No. 21350, 2006-Ohio-5757.
 {¶ 6} Pursuant to Civil Rule 56(C), summary judgment is proper if: "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Temple v. Wean United, Inc.
(1977), 50 Ohio St.2d 317, 327, 364 N.E.2d 3 267. To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Dresher v. Burt (1996), 75 Ohio St.3d 280,293, 662 N.E.2d 264. The non-moving party must then present evidence that some issue of material fact remains for the trial court to resolve. Id.
 {¶ 7} According to Brown, she "elicited evidence which could be reasonably found by a jury as constituting a nuisance: (A) Appellee knew of the disrepair of the west side of Westwood Park Pool's perimeter fence; (B) Appellee knew or should have known of the disrepair of the east side abutting fence; (C) Appellee knew or should have known that the fence itself was ineffective; (D) Appellee knew the pool's perimeter fence was being frequently breached; (E) Appellee knew children were swimming in the pool after-hours; (F) Appellee should have reasonably foreseen that some of those persons in the pool after-hours would be too young to appreciate the inherent dangers presented by an unattended, unguarded swimming pool; (G) Appellee violated its own policies and procedures by not adequately inspecting the perimeter fencing before the pool opened on July 3, 1999 and/or not informing supervisors of the defects; (H) Appellee did not change its policies and procedures of the pool's facilities themselves to prevent children from swimming after-hours; and (I) Appellee violated statutory and administrative mandates."
 {¶ 8} We initially note that Brown's second claim for relief alleged, "[a]s Westwood Pool was under the exclusive control of Defendant, Defendant is liable pursuant to the doctrine of res ipsaloquitur." The trial court correctly dismissed this claim, determining that res ipsa loquitur is not a cause of action but rather a rule of evidence "which allows the trier of facts to draw an inference of negligence from the facts presented." Morgan v. Children's Hospital
(1985), 18 Ohio St.3d 185, 187, 480 N.E.2d 464.
 {¶ 9} The trial court went on to determine that Brown's remaining claims were barred by the sovereign immunity granted to political subdivisions in R.C. Chapter 2744 et seq. We recently set forth the three-tiered analysis for statutory immunity as follows: "The starting point is the general rule that the subdivision is immune from tort liability for any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function. R.C. Section 2744.02(A)(1). In the second step, any immunity which that section grants may be abrogated by one of the five exceptions listed in R.C. Section 2744.02(B). Finally, if immunity is lost to an exception, the political subdivision may assert one of the statutory defenses to liability." Fitzpatrick v. Spencer, Montgomery App. No. 20067, 2004-Ohio-1940.
 {¶ 10} It is undisputed that the City of Dayton is a political subdivision, and so we must analyze whether one of the five exceptions to statutory immunity set forth in R.C. 2744.02(B) applies. Since the events giving rise to the matter herein occurred in 1999, the trial court correctly reviewed the statute as in effect then.
 {¶ 11} "A `governmental function' includes * * * the operation of any * * * recreational area or facility, including * * * [a] * * * swimming pool." R.C. 2744.01(C)(2)(u)(iv). The City of Dayton is required to properly maintain the pool's fences and barriers "to secure against unauthorized entry." O.A.C. 3701-31-04(M)(4).
 {¶ 12} Brown initially asserts that the City of Dayton lacks immunity due to the City's "failure to keep * * * public grounds within the political subdivisions open, in repair, and free from nuisance." R.C. 2744.02(B)(3). "Actual or constructive notice remains a prerequisite to liability under R.C. 2744.02(B)(3)." Harp v. Cleveland Heights (2000),87 Ohio St.3d 506, 513.
 {¶ 13} The Westwood pool, now closed, was surrounded by a chain link fence and a cement wall on its north side, a cement wall on its east side, a bathhouse on its south side, and chain link fencing on its west side. The main entrance was through the bathhouse, and there were two access entrances through the west fence. Another fence ran perpendicular to and abutted the cement wall on the east side, outside of the pool area.
 {¶ 14} According to the trial court, the only evidence before it of a defect in the fence at the time that Davionte entered the pool was "a picture provided by Defendant showing a cut in the fence surrounding a concrete wall that is taller than the fence." The trial court's description of the fence is inaccurate; the photograph actually depicts the chain link fence perpendicular to, and not surrounding, the eastern perimeter wall. In response to the picture, Brown argued before the trial court that "Defendant has supplied the Court with an irrelevant picture from the wrong corner of the pool. A jury would be hard-pressed to find that the child entered the pool by scaling the block wall when there is no evidence that's what happened. Instead, the City's employee and a neighborhood witness have testified as to defects in the fence which allowed the child's entry, and a jury could reasonably so find." Despite her initial dismissal of the picture as immaterial to her claims, Brown herein has shifted her theory of liability, now arguing in her brief that "a jury could readily conclude that the stairstepping pattern of defects in the [abutting] fence would allow * * * a youth to climb the fence as a ladder to aid in scaling the concrete wall."
 {¶ 15} Gregory Duckro, superintendent of parks and forestry for the City of Dayton, testified that he proceeded to Westwood Pool on July 3, 1999, upon notification of the ncident at issue. Duckro stated that he was directed by William Gillespie, then deputy city manager, to the section of fence that "abutted the concrete, or concrete block wall, that surrounds the pool. The fence had several holes in it and a pattern stairstepping fence" such that someone could place their feet in the holes to climb up the fence. Duckro testified that "Mr. Gillespie wanted to remove that first section of fence away from that site to abate the hazard." Duckro stated that upon inspection he did not see any damage to the fence on the west side of the pool. According to Duckro, "Anyone could have climbed the fence on any other portion of the facility." He further stated that, when he or his department received a report of fence cuts at a pool facility for the City of Dayton, repairs were required to be made the same day.
 {¶ 16} Brown's aquatics expert, Shawn DeRosa, via affidavit, averred that the applicable standard of care requires daily inspections of perimeter fences and repairs the same day.
 {¶ 17} Sue Wilkinson, program developer for the department of parks, recreation, and culture for the City of Dayton, testified that upon arrival each day, the swimming pool staff "are instructed to do a complete survey of the pool to check for vandalism, fence cuts, and we call ours in." She further stated, "What we do to keep kids coming in from after hours is follow the health department rules and regulations, check all perimeter fences, make sure all gates are closed, make sure we put the danger, pool closed sign up, posted, no trespassing. That's what we do to make sure that people don't come in. Now, whether they choose to ignore that, that's an individual decision."
 {¶ 18} The City of Dayton produced its own work orders showing that repairs were conducted on the pool fence on July 1, 1999, and July 3, 1999.
 {¶ 19} Thomas Hall, western neighbor of the pool, testified regarding vandalism to the perimeter fence: "They have a fence there. I guess it's approximately eight or ten feet high. They climb over that fence. They also cut the fence and go through the fence." Hall agreed that he noticed these events before July of 1999, and that he "[t]alked quite often" with pool staff "within the last two or three years prior to the drowning" about after hours swimming. He also testified that when the pool was not open a "big sign" was posted making it clear that the pool was closed, and that the gate was locked. He described the City of Dayton employees' repairs of the fence as "very" timely. According to Hall, "they could repair the fence in the morning before they opened the pool or during the day and the next night it could be the same thing over again."
 {¶ 20} We agree with the trial court that the only evidence of a defect in the fencing on July 3, 1999, involved a section that Brown termed "irrelevant" to her claims. In other words, the trial court correctly found that Brown "failed to make [a] causal connection between Plaintiff's injuries and Defendant's failure to keep the fence in repair or free from nuisance." Given the lack of evidence of a defect elsewhere in the fence on July 3, 1999, by means of which Davionte gained access to the pool, the trial court correctly concluded "no question of fact exists as to the applicability of the exception to sovereign immunity found in" R.C. 2744.02(B)(3). In other words, under the facts herein, "the pool was clearly closed and anyone entering was trespassing. Such does not constitute a nuisance."
 {¶ 21} As to the alleged violations of statutory and administrative mandates, Brown argues that several work orders show that the City of Dayton was slow to respond to necessary repairs. This evidence, however, does not create a genuine issue of material fact as to the presence of a defect in the fence by means of which Davionte and his brother gained access to the pool.
 {¶ 22} Brown next relies on the exception in R.C. 2744.02(B)(4), which provides, "Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility * * * .". In her Complaint, Brown asserted, "Pursuant to O.R.C. 2744.02(B)(4) and Cater v. Cleveland, 83 Ohio St.3d 24, (1998), Defendant City of Dayton is liable for Plaintiffs decedent's injuries and his wrongful death and Plaintiffs damages * * * for Defendant's negligent, reckless, willful and wanton and/or malicious actions." Brown then enumerated 23 alleged failures justifying relief under R.C. 2744.02(B)(4). In its Motion for Summary Judgment, the City of Dayton argued that "there is only [one] exception [enumerated in R.C. 2744.02(B)] that could even arguably apply to this case", citing R.C. 2744(B)(3).
 {¶ 23} The trial court determined the "law is somewhat murky as to whether [R.C. 2744(B)(4)] applies to the operation of a swimming pool by a political subdivision. * * * [T]his issue is irrelevant because Plaintiff has not indicated that she is asserting O.R.C. Section 2744.02(B)(4) as a basis for immunity [sic], and more importantly, has further failed to produce evidence that Defendant's negligence caused her injuries."
 {¶ 24} Given the contents of Brown's complaint, we disagree with the trial court's assertion that Brown did not suggest that the City of Dayton's immunity was abrogated by R.C. 2744.02(B)(4). We need not reach the issue of whether or not R.C. 2744.02(B)(4) applies herein, because we agree with the trial court that Brown has not produced any evidence of negligence on the part of the City of Dayton's employees that proximately caused Davionte's death. As discussed above, the only evidence of a defect in the fence was rejected by Brown as the children's means of ingress to the pool. Assuming, arguendo, that the children entered at this section of the fence, however, it is clear they would have had to scale the fence to trespass into the pool area and there is no evidence the cuts/defects pre-existed this event nor that the City failed to repair a known defect. While Brown lists several incidences of alleged negligence on the part of the City of Dayton as follows: "(E.g., having a CPR mask available with or without oxygen which is known to provide a better airtight seal improving the efficiency of CPR; having a marked telephone available so that authorities could have been notified in a more timely fashion; having an inexpensive alarm system in the pool to alert and discourage those involved with after-hours swimming, etc.)," there was simply no evidence before the trial court to create a genuine issue of material fact.
 {¶ 25} Finally, Brown argues that a jury "should be allowed to determine that Appellee is not entitled to the immunity" provided by R.C. 2744.03(A)(3) or (5). However, Brown failed to demonstrate a genuine issue of material fact which would deprive the City of immunity.
 {¶ 26} Having reviewed the record, we conclude that Brown failed to create a genuine issue of material fact on any of her claims against the City of Dayton. Reasonable minds can only conclude that Brown failed to show that the City of Dayton lacked sovereign immunity. Accordingly, the trial court correctly determined that the City of Dayton was entitled to judgment as a matter of law. Judgment affirmed.
GRADY, P.J. and BROGAN, J., concur.