HOWARD, Appellant,

v.

MIAMI TOWNSHIP FIRE DIVISION, Appellee.

[Cite as *Howard v. Miami Twp. Fire Div.*, 171 Ohio App.3d 184, 2007-Ohio-1508.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 21478.

Decided March 30, 2007.

Dyer, Garofalo, Mann & Schultz and John A. Smalley, for appellant.

Surdyk, Dowd & Turner Co., L.P.A., and Robert J. Surdyk, for appellees.

BROGAN, Judge.

{¶ 1} Donald Howard, as administrator of the estate of Christopher Howard, appeals from the judgment of the Montgomery County Common Pleas Court in favor of Miami Township.

{¶ 2} The facts underlying this appeal are set out in the trial court's decision granting the township summary judgment in this matter. The facts are as follows:

{¶ 3} "On 24 January 2004, Defendant, Miami Township Fire Department (hereinafter 'Township') conducted a live fire training evolution at 5460 Bear Creek Road, Miamisburg, Ohio. As part of the planning for this live fire training,

the Fire Department notified various environmental agencies and obtained the requisite documents and inspections. Additionally, several of the Lieutenants and Deputy Chief Queen created a training plan that included the type and location of the fire engines and other equipment to be used; the amount of water to have on hand at the burn; the location of the crews; and the manner in which the building would be burned.

{¶ 4} "The training evolution began at approximately 9:00 a.m. and continued until approximately 2:30 p.m. The training consisted of a series of several live fires and involved different crews from the Fire Department. At the conclusion of the training the remaining portion of the structure was systematically burned such that as the structure burned it fell into the basement. At approximately 4:30 p.m. the structure had dropped into the basement and the majority of it was consumed. The equipment was removed from the burn site and placed back into service. The Township dispatch center was notified that the training evolutions were complete. Deputy Chief Hoffman, the fire deputy chief on duty, requested that the police patrol the cite [sic] occasionally throughout the night. Additionally, a crew from Fire Department 49 was assigned to periodically visit the site to ensure that the fire was out and to apply road salt as needed.

{¶ 5} "At about 6:00 p.m. three members from Station 49 visited the burn site to check the embers from the fire and to spread salt on the road where water ran down from the burnsite and onto the road. Two of the firefighters each testified in his deposition that they spread a five gallon bucket of salt on the affected area of the roadway. They further stated that there was no ice on the roadway at that time. The firefighters returned to the site at about 7:30 p.m. and remained there for about one half hour, again checking the embers from the fire and checking the road for water and ice. Firefighter Pirk testified that had there been ice on the road at that time 'we would have called for a salt truck and notified our shift commander.' No salt was added to the road at that time.

{¶ 6} "In addition to the periodic visits to the burn site by the firefighters, Miami Township Police Officer Aronoff ('Aronoff') was patrolling, among other roads, Bear Creek Road. He traveled on Bear Creek Road at approximately 5:00 p.m. and again at about 9:00 p.m. During the 9:00 p.m. pass on Bear Creek Road, Aronoff conducted a traffic stop within a few hundred feet of the burn site.

{¶ 7} "At approximately 9:50 p.m. Christopher Howard and a friend, Robin Butler (non-party; 'Butler'), were traveling in Howard's car, northbound on Bear Creek Road. Howard was the driver of the car. After entering the left hand curve just past the burn site, Howard lost control of the car, crashed into a tree and died as a result of the accident. Butler was able to free herself from the wreckage and was transported to the hospital.

{¶ 8} "It is important to understand the layout of the burn site and its physical relationship to Bear Creek Road. Bear Creek Road is characterized by the police report attached to several of the depositions as a 'gently rolling rural road with several curves.' The un-posted speed limit on a rural road is 55 mph; however, there are several yellow caution signs posted on Bear Creek Road, indicating the type of curve that lies ahead and the recommended speed at which the curve should be negotiated. One such sign is located just north of the burn site driveway and indicates a sharp curve ahead and recommends a speed of 30 mph. The burn site itself sits on a hill, accessed by a steep drive from Bear Creek Road. The driveway access to the burn site is just before Bear Creek Road [sic] curves to the left, if one is traveling north on Bear Creek Road.

{¶ 9} "Aronoff was dispatched to the accident and was the first police officer to arrive at the scene. He remembers that the road was wet; that water was pooling on the side of the road at the bottom of the burn site; and that he pointed the water out to another police officer, Sgt. Fitzgerald ('Fitzgerald') because he was concerned that the water could freeze.

{¶ 10} "Sergeant Scott C. Fitzgerald ('Fitzgerald') knew that the Fire Department was going to conduct a controlled burn on 24 January 2004. He was on duty that day, but did not visit the burn site until he was dispatched to the accident scene. Upon arriving at the scene Fitzgerald questioned Aronoff about the accident. Aronoff pointed out the water runoff from the burn site, down the driveway, onto the roadway. Fitzgerald testified that he observed, water, some ice, and some slush on the roadway, as well as fresh water flowing onto the roadway.

{¶ 11} "Sergeant Rex A. Thompson ('Thompson'), was called at home to report to the crash site. He arrived at 10:19 p.m. He was responsible for collecting evidence to reconstruct the accident. Included in the data he collected was information from the sensing diagnostic module, air bag sensor ('SDM'). Thompson testified at his deposition that the information collected from SDM indicated that Howard's vehicle was traveling at 60 mph five seconds prior to the crash. Thompson further testified, that, from viewing pictures taken of the roadway the night of the accident, the road was wet and possibly slushy, but he could not tell from the pictures whether the road was icy.

{¶ 12} "Howard's Response contains an affidavit from his expert witness, accident reconstructions Fred Lickert ('Lickert'). Lickert states that '[i]t was not merely the speed of the plaintiff's vehicle that made this condition unsafe. Although the speed at which Mr. Howard attempted to take this turn was careless, it did not change the fact that this roadway presented a hazardous condition to ordinary users of the roadway.' Lickert further states that it is possible for a vehicle, under optimal conditions, to negotiate the curve at speeds

up to 70.9 mph. Lickert states that [sic] is his 'professional opinion, with a reasonable certainty, that the actions and inactions of the Miami Township Fire Department in failing to address the hazardous condition of the roadway were a proximate and contributing cause of this fatal accident.' Lickert bases this opinion on his review of the depositions filed in this case and his personal observations of the scene of the accident on 29 January 2004; 10 February 2004 and 2 June 2004.

{¶ 13} "Howard's parents filed the instant action against Miami Township Fire Division and Miami Township claiming that the Township, through the actions of its employees was negligent and, as such, is liable for Howard's death. Township filed its Motion for Summary Judgment arguing that it is immune from liability pursuant to O.R.C. 2744, *et seq.*"

{¶ 14} The trial court granted summary judgment in favor of the township. According to the court, the water and ice on Bear Creek Road did not amount to an "obstruction" as contemplated by R.C. 2744.02(B)(3). This statute imposes liability upon political subdivisions "for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads * * *." The court found that "obstruction" should be given its ordinary definition—something that "blocks or closes up by obstacle." In reaching this conclusion, the court relied on the word's application in cases decided under former R.C. 2744.02(B)(3), which held political subdivisions "liable for injury, death, or loss to person or property caused by their failure to keep public roads * * * *free from nuisance* * * *." (Emphasis added.) In those cases, "certain obstructions to a driver's ability to see the road could constitute a nuisance." Since passage through or the ability to see Bear Creek Road had not been blocked by any obstacle, the court determined that the water and ice on the road did not amount to an "obstruction" by definition or by application. Therefore, the trial court held that the township was not liable for Christopher Howard's death.

{¶ 15} On appeal, Howard raises one assignment of error: the trial court erred in finding that the township was immune from suit as a matter of law pursuant to R.C. Chapter 2744. As an appellate court, our review of trial court decisions on summary judgment is de novo, which means that we apply the same standard as the trial court, viewing the facts in the case in a light most favorable to the nonmoving party and resolving any doubt in favor of the nonmoving party. *Brown v. Dayton,* Montgomery App. No. 21542, 2006-Ohio-6816, 2006 WL 3759579, at ¶ 5. Trial courts will appropriately grant summary judgment where they find "(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party

against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46.

{¶ 16} Upon review of the record, we find that the trial court erred in granting the township's motion for summary judgment. Under R.C. 2744.02(B)(3), "obstruction" should be construed to include any object that has the potential of interfering with the safe passage of motorists on public roads. Therefore, pursuant to the statute, the township is not entitled to judgment as a matter of law where the ice and water mixture that formed on Bear Creek Road on the night of Christopher Howard's accident constituted an obstruction. This obstruction was caused by water flowing from the site of the live-fire-training evolution conducted earlier that day by the township. Furthermore, we find that a genuine issue of material fact exists as to whether the township acted negligently in failing to remove the icy mixture from the road. Finally, the township will not have a defense to liability under R.C. 2744.03(A)(3) or (5). It is not an exercise of a political subdivision's discretion to eliminate an obvious potential hazard from public roads. Accordingly, the judgment of the trial court will be reversed and the cause remanded for further proceedings.

## I

{¶ 17} Under his sole assignment of error, Howard contends that the trial court erred by finding the township immune from liability pursuant to R.C. 2744.02(B)(3). R.C. Chapter 2744, also known as the Political Subdivision Tort Liability Act, requires a three-tiered analysis to determine whether a political subdivision should be immune from liability. *Sherwin Williams Co. v. Dayton Freight Lines,* 161 Ohio App.3d 444, 2005-Ohio-2773, 830 N.E.2d 1208, at ¶ 9. First, under R.C. 2744.02(A)(1), political subdivisions are generally not liable in damages when performing a governmental or proprietary function. Id. After establishing immunity, the next tier of the analysis turns on whether one of the exceptions to immunity set forth in R.C. 2744.02(B)(1) through (5) applies. Id. Finally, political subdivisions may overcome the exceptions and have immunity reinstated if they demonstrate that one of the defenses contained in R.C. 2744.03 applies. Id.

{¶ 18} The first issue that we must address is whether one of the exceptions to immunity, specifically R.C. 2744.02(B)(3), imposes liability upon the township for Christopher Howard's death. R.C. 2744.02(B)(3) states that "[e]xcept as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads." This current version of subsection (B)(3) was

part of Senate Bill 106, which became effective in April 2003. Prior to that date, R.C. 2744.02(B)(3) read, "Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by their failure to keep public roads, highways, streets, avenues, alleys, sidewalks, bridges, aqueducts, viaducts, or public grounds within the political subdivisions open, in repair, and free from nuisance * * *." In amending the statute, the General Assembly limited the scope of political subdivisions' responsibility to public roads only, which it defined as "public roads, highways, streets, avenues, alleys, and bridges within a political subdivision. 'Public roads' does not include berms, shoulders, rights-of-way, or traffic control devices * * *." R.C. 2744.01(H).

{¶ 19} Furthermore, the General Assembly replaced "free from nuisance" with "other negligent failure to remove obstructions." Under former R.C. 2744.02(B)(3), courts broadly interpreted "nuisance" to be "conditions that directly jeopardize the safety of traffic on the highway." *Manufacturer's Natl. Bank of Detroit v. Erie Cty. Road Comm.* (1992), 63 Ohio St.3d 318, 322, 587 N.E.2d 819. This included conditions outside of the paved surface of roadways, as well as conditions on roads themselves. For example, a nuisance could be a permanent obstruction to visibility not on a public road, such as growing crops, that made it unsafe for the usual and ordinary course of travel within a highway right-of-way. Id. at 323, 587 N.E.2d 819. See, also, *Harp v. Cleveland Hts.* (2000), 87 Ohio St.3d 506, 721 N.E.2d 1020 (holding that a defective tree limb threatening to fall on a public roadway, but not obstructing the roadway, constitutes a nuisance under R.C. 2744.02(B)(3)); *Sherwin Williams Co. v. Dayton Freight Lines,* 161 Ohio App.3d 444, 2005-Ohio-2773, 830 N.E.2d 1208 (finding that smoke emanating from a burn site and obstructing the vision of drivers on a nearby interstate constituted a nuisance pursuant to R.C. 2744.02(B)(3)); *McQuaide v. Bd. of Commrs. of Hamilton Cty.,* Hamilton App. No. C–030033, 2003-Ohio-4420, 2003 WL 21991337, at ¶ 12–13 (finding that a four-degree incline in a right-of-way did not constitute a nuisance where prior accidents cited by the appellant occurring in the general area of the incline did not establish that the incline caused the accidents or that the incline could not be traversed safely in the course of ordinary travel). By amending R.C. 2744.02(B)(3), it is reasonable to conclude that the General Assembly was responding to these cases in which the duty of political subdivisions to care for their public roadways extended beyond the paved and traveled portion of the roadways themselves. While a nuisance may come from outside of the boundaries of the roadway, an "obstruction" implies an object located on the roadway, over which the political subdivision has direct control for taking action to correct. See *Harp,* 87 Ohio St.3d at 512, 721 N.E.2d 1020 (interpreting the language "free from nuisance" in former R.C. 2744.02(B)(3) to mean that a political subdivision has a greater duty of care beyond merely

removing obstructions from public roads). However, neither R.C. Chapter 2744 nor case law dealing with this statute has defined the term "obstruction."

{¶ 20} In the event that statutes fail to define the intended meanings of words therein, the words must be given their plain and ordinary meaning, unless legislative intent indicates otherwise. *State ex rel. Montgomery Cty. Pub. Defender v. Rosencrans*, Montgomery App. No. CA20416, 2005-Ohio-6681, 2005 WL 3454738, at ¶ 18. The plain and ordinary meaning of "obstruction" is "(1) One that obstructs: OBSTACLE; (2) An act or instance of obstructing; (3) The act of impeding or an attempt to impede the conduct of esp. legislative business." Webster's II New College Dictionary (1995) 755. "Obstruct" is defined as "(1) To clog or block (a passage) with obstacles; (2) To impede, retard, or interfere with <*obstruct* legislation>; (3) To cut off from sight." Id. Several courts have recently relied on this definition of "obstruction" in determining the extent of political subdivisions' liability pursuant to R.C. 2744.02(B)(3). See *Parker v. Upper Arlington*, Franklin App. No. 05AP–695, 2006-Ohio-1649, 2006 WL 832523, at ¶ 14 (finding that stop signs, painted crosswalks, and sidewalk ramps do not "block up" or present "an obstacle or impediment to passing" through the public roadways); *Huffman v. Bd. of Cty. Commrs.*, Columbiana App. No. 05 CO 71, 2006-Ohio-3479, 2006 WL 1851715, at ¶ 53 (interpreting "obstruction" to include a fallen bridge).

{¶ 21} We also find it instructive to examine the General Assembly's use of the word "obstruction" in other contextually similar provisions of the Revised Code. R.C. 5547.04 provides that "[t]he owner or occupant of lands situated along the highways shall remove all obstructions within the bounds of the highways, which have been placed there by them or their agents, or with their consent. * * * No person, partnership, or corporation shall erect, within the bounds of any highway or on the bridges or culverts thereon, any obstruction without first obtaining the approval of the board [of county commissioners] in case of highways other than roads and highways on the state highway system and the bridges and culverts thereon."

{¶ 22} On several occasions, the Ohio Attorney General has interpreted the meaning of "obstruction" within R.C. 5547.04. Specifically, in response to whether this section authorizes a county to remove foreign materials blocking a side ditch within the county's right-of-way that interfere with the free flow of water and impair the function of the county road, the Ohio Attorney General provided:

{¶ 23} "In putting these parts of R.C. 5547.04 together, it becomes clear that the General Assembly intended that the word 'obstruction' have a very broad meaning. In order to give effect to this intention of the General Assembly, it appears that 'obstruction' must be defined so as to include virtually any object within the bounds of a highway that has been 'placed' or 'erected' there. In other

words, an 'obstruction' is any object that has the potential of interfering with the highway easement. An object could interfere with the easement without hindering the flow or traffic or the construction or maintenance of the highway. Whether an object interferes with the easement will depend upon the nature of the object, its size, and its precise location." 1980 Ohio Atty.Gen.Ops. No. 80–071, at 2–282. See, also, 1980 Ohio Atty.Gen.Ops. No. 80–043, at 2–181 (finding that pipes and conduits in a township road constitute an "obstruction," whereby a company seeking to install such pipes and conduits must first receive approval from the board of county commissioners).

■ {¶ 24} In light of the foregoing definitions, we find that "obstruction," as it is used in R.C. 2744.02(B)(3), should be interpreted to mean any object placed or erected in a public roadway that has the potential of interfering with the public's use of that roadway. An interference occurs when the public's safe use of the roadway is jeopardized. Moreover, the severity of the interference will depend upon the nature of the object, the object's size, and the object's location on the roadway.

■ {¶ 25} In the present action, Howard contends that an icy, slushy, and watery mixture at the "S" curve on Bear Creek Road, created by the township's live-fire exercise, obstructed the safe passage of the road by his son on the night of his death. In contrast, the township argues that the uncontroverted evidence established that the ice (if it was present) did not constitute an "obstruction" on the roadway. The township argues that "obstruction" instead clearly contemplates something which physically blocks the road, preventing cars from passing.

{¶ 26} We agree with Howard, based on our interpretation of the meaning of "obstruction." "R.C. 2744.02(B)(3) imposes on political subdivisions a duty of care to keep highways open and safe for public travel." *Manufacturer's Natl. Bank of Detroit v. Erie Cty. Road Comm.*, 63 Ohio St.3d at 321, 587 N.E.2d 819. See, also, *Floering v. Roller*, Wood App. No. WD–02–076, 2003-Ohio-5679, 2003 WL 22417127, at ¶ 27 (interpreting the current version of R.C. 2744.02(B)(3) as imposing the same duty of care on political subdivisions as it did when the statute's language included "free from nuisance"). The icy mixture was the direct result of the run-off of water from the township's live-burn exercise. Clearly, an icy mixture on a public roadway has the potential of interfering with the public's safe use of the roadway by creating an opportunity for loss of traction and/or loss of control of a vehicle. In this instance, the severity of the interference was substantial, as the ice and water obstruction covered the entire width of the roadway for approximately ten to 15 yards, at a point where the road makes a sharp curve to the left when traveling north. Thus, we find that the township was not entitled to judgment as a matter of law under R.C.

2744.02(B)(3), because the political subdivision had a duty of care to remove this obstruction from the road.

## II

{¶ 27} The remaining issue at this point is whether the township *negligently* failed to remove the obstruction from Bear Creek Road. The trial court did not address this issue except to state that Howard could not demonstrate that the water and ice were a nuisance or an obstruction under the analysis set forth in *Haynes v. Franklin*, 95 Ohio St.3d 344, 2002-Ohio-2334, 767 N.E.2d 1146, at ¶ 18. To withstand a motion for summary judgment under *Haynes*, the plaintiff must establish that "the condition alleged to constitute a nuisance creates a danger for ordinary traffic on the regularly traveled portion of the road" and that the cause of the condition was not "a decision regarding design and construction." Id. According to the trial court, because Christopher Howard was traveling 30 mph in excess of the posted cautionary speed at the time of the accident, he was not traveling in the "usual and ordinary manner." Therefore, the court determined that Howard could not satisfy the first prong of the *Haynes* analysis.

{¶ 28} We find the trial court's application of *Haynes* to be erroneous. In this case, the parties are not attempting to demonstrate that the ice and water on the road constituted a nuisance under former R.C. 2744.02(B)(3). Instead, they are arguing that the condition constituted an "obstruction." Under the amended version of R.C. 2744.02(B)(3), the township will be liable for the death of Christopher Howard if found to have negligently failed to remove the obstruction from Bear Creek Road. Therefore, the correct question to ask is whether the township acted negligently in failing to remove the ice and water from the road. See *Huffman v. Bd. of Cty. Commrs.*, Columbiana App. No. 05 CO 71, 2006-Ohio-3479, 2006 WL 1851715, at ¶ 60. As to this question, we find that there is a genuine issue of material fact.

{¶ 29} The record indicates that once the township noticed water was flowing from the burn site onto Bear Creek Road, Deputy Chief Hoffman ordered firefighters Keyser, Pirk, and Lieutenant Haney to monitor the roadway's condition. Hoffman also directed these firefighters to pick up salt from Station 49 and apply it to the road. Following these directions, the firefighters spread a five-gallon bucket of salt mainly in front of the driveway on Bear Creek Road leading to the burn site. They applied the salt to a 20–foot portion of the road that was wet. According to Pirk, he did not notice any ice on the road at that time. However, knowing that the temperature would drop throughout the night, Keyser suggested calling a salt truck. No salt truck was called to the scene that night.

{¶ 30} The firefighters checked the burn site again approximately one hour later. At this time, they checked the burning embers left over from the training exercise, but they did not check the condition of the roadway. Firefighter Pirk stated that had there been ice on the road, they would have called for a salt truck and notified their shift commander, Hoffman.

{¶ 31} The accident happened at approximately 9:50 p.m. The police report written by Officer P.M. McCoy provides that Christopher Howard and Robyn Butler were traveling northbound on Bear Creek Road at a speed of 60 m.p.h. The section of the road at which the accident took place curves to the left, and a sign indicating "curve ahead" and a suggested speed of 30 m.p.h. is posted there. The report indicates that Howard lost control of his vehicle and slid up a grass-covered berm before vaulting into the air. The roof of the vehicle impacted a tree, causing it to collapse and crush Howard. The passenger side was not crushed by the impact, which allowed Butler to free herself from the car. At the end of the report, McCoy stated that he could not "determine, with any certainty, that the condition of the roadway surface, i.e., ice and/or water, caused [Howard] to lose control."

{¶ 32} Officer Aronoff, who was called to the scene of the accident, reported that he noticed icy conditions on the roadway. Likewise, Sergeant Fitzgerald testified that he saw ice and water on approximately ten to 15 yards of the road: "It was some areas were wet, some areas frozen, some areas you could walk through, kind of splashed a little bit like it was slushy. It's almost like it wasn't conforming to each other. It was just like – it was just kind of strange. You'd have maybe a slushy patch here, free flowing water over here, and icy over here (indicating)."

{¶ 33} Miami Township Police Department's accident reconstructionist, Sergeant R.A. Thompson, stated in his report that Howard failed to negotiate the curve as a result of the road being "[s]tricken with water, rock salt, and some ice." Furthermore, Howard's reconstructionist, Fred Lickert, testified that "[t]he running water, slush, and ice on [Bear Creek Road] created an unsafe condition for ordinary users of the roadway * * *."

{¶ 34} Based on the foregoing deposition and affidavit evidence before the trial court, we find that a genuine issue of material fact exists as to whether the township negligently failed to remove the icy mixture from Bear Creek Road. Insofar as we have determined that the ice and water residue constitutes an "obstruction" for purposes of R.C. 2744.02(B)(3), and that a genuine issue of material fact exists as to whether the township acted negligently in failing to remove that obstruction, we remand this matter to the trial court for further proceedings.

III

{¶ 35} Although it held that the township was entitled to judgment as a matter of law because the ice and water mixture did not constitute an "obstruction" per R.C. 2744.02(B)(3), the trial court nonetheless found that the discretionary defenses set forth in R.C. 2744.03 would reinstate the township's immunity should an exception apply. As stated above, political subdivisions found to be liable under one of the exceptions in R.C. 2744.02 may be granted immunity if they can successfully demonstrate that one of the defenses contained in R.C. 2744.03 applies. The township argues that even if an exception to immunity applied to this case, the live-fire exercise and "clean up" involved a planning function embodying the making of basic policy decisions that required a high degree of discretion to which immunity would attach. This defense is embodied in R.C. 2744.03(A)(3) and (5). Subsection (A)(3) provides that "[t]he political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee." Subsection (A)(5) states that "[t]he political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 36} In *Franks v. Lopez* (1994), 69 Ohio St.3d 345, 632 N.E.2d 502, the Ohio Supreme Court stated that "[o]verhanging branches and foliage which obscure traffic signs, malfunctioning traffic signals, signs which have lost their capacity to reflect, *or even physical impediments such as potholes, are easily discoverable, and the elimination of such hazards involves no discretion, policy-making or engineering judgment.* The political subdivision has the responsibility to abate them and it will not be immune from liability for its failure to do so." (Emphasis added.) Id. at 349, 632 N.E.2d 502. See, also, *Huffman v. Bd. of Cty. Commrs.*, Columbiana App. No. 05 CO 71, 2006-Ohio-3479, 2006 WL 1851715, at ¶ 57–60 (refusing to find that a decision to barricade a fallen bridge called for a discretionary decision). Furthermore, the First District Court of Appeals has found that when an exception to liability exists under R.C. 2744.02(B)(3), a city's exercise of some discretion will still not abrogate its duty to keep its streets free from a nuisance. *Dillard v. Cincinnati*, Hamilton App. No. C–050045, 2005-Ohio-6819, 2005 WL 3501854, at ¶ 17. Although the court reached its decision under the parameters of former R.C. 2744.02(B)(3), the general contention is that political subdivisions may not thwart liability where they have a duty to keep

public roadways safe for travel. This would certainly apply pursuant to the amended version of the statute, which calls for political subdivisions "to remove obstructions from public roads."

{¶ 37} Here, the township asserts that planning and implementing the live-fire training evolution on Bear Creek Road involved its personnel exercising their discretion in "the preparation and in how they used their people and equipment." Specifically, the township contends that it exercised its discretion in assigning fire and police personnel and equipment to monitor the burn site and spread salt on the road when necessary. Based on *Franks*, however, we find the decision to spread salt across the road not to be one which calls for discretion, policy-making, or engineering judgment, but to be a reaction to an obvious physical impediment, i.e., ice forming on a paved surface. The township had a duty to remove this obstruction from Bear Creek Road, and spreading salt on the potentially hazardous icy mixture was simply the manner in which the township attempted to fulfill its duty. Therefore, we find that the trial court incorrectly concluded that the discretionary defenses set forth in R.C. 2744.03(A)(3) and (5) would reinstate the township's immunity should the trier of fact determine that the township negligently failed to remove an obstruction from a public road per R.C. 2744.02(B)(3).

{¶ 38} Accordingly, Howard's single assignment of error is sustained. The judgment of the trial court is reversed, and the cause is remanded for further proceedings consistent with this opinion and the law.

Judgment reversed
and cause remanded.

FAIN and GRADY, JJ., concur.