HOWARD, APPELLEE, ET AL., *v.* MIAMI TOWNSHIP
FIRE DIVISION ET AL., APPELLANTS.

[Cite as *Howard v. Miami Twp. Fire Div.*,
119 Ohio St.3d 1, 2008-Ohio-2792.]

(No. 2007–0873—Submitted March 11, 2008—Decided June 18, 2008.)

O'CONNOR, J.

{¶ 1} This appeal presents a discrete issue: Is an accumulation of ice on a roadway an "obstruction" within the meaning of R.C. 2744.02(B)(3)? We hold that it is not.

RELEVANT BACKGROUND

{¶ 2} Because this case was decided on a motion for summary judgment, we view the facts in the light most favorable to appellee, Donald Howard, as administrator of the estate of Christopher Howard, against whom the trial court entered summary judgment. *State ex rel. Zimmerman v. Tompkins* (1996), 75 Ohio St.3d 447, 448, 663 N.E.2d 639.

{¶ 3} On January 24, 2004, appellant Miami Township Fire Department conducted a day-long training exercise at 5460 Bear Creek Road in Miami Township, Montgomery County. The training involved various crews and engines from the fire department responding to real fires deliberately set by fire officials in a former dwelling on the burn site.

{¶ 4} The burn site is an elevated area accessed by a driveway that runs from Bear Creek Road, a gently rolling rural road. Bear Creek road has several curves, and many yellow caution signs are posted along it to indicate the type of curve that lies ahead and the recommended speed at which the curve should be negotiated. One such sign, located near the burn site's driveway, indicates a sharp right curve ahead and recommends a speed of 30 miles per hour.

{¶ 5} Water used by firefighters during the training ran from the burn site down to Bear Creek Road. At the conclusion of the training, a deputy fire chief

on duty at the burn site ordered the fire department's crews to periodically visit the burn site that evening to ensure that the fire was out and to apply road salt as needed to Bear Creek Road. He also requested that local police patrol the area that evening.

{¶ 6} Although firefighters who visited the burn site at approximately 6:00 p.m. did not find ice on the road, they spread a five-gallon bucket of salt where water had run down from the burn site onto the roadway. When they left the scene, the portions of the road that were wet were "well salted."

{¶ 7} The firefighters returned to the site at about 7:30 p.m. and remained there for approximately 30 minutes, again checking the road for water and ice. None was found, and no salt was added to Bear Creek Road at that time.

{¶ 8} Police also patrolled the area, and there was evidence that at approximately 9:00 p.m., the northbound side of the road was wet.

{¶ 9} At approximately 10:00 p.m., appellee's 16–year–old son, Christopher Howard, drove his car northbound on Bear Creek Road with a friend, Robyn Butler, as his passenger. According to Butler, Christopher had successfully managed to negotiate the curve near the burn site while traveling at 50 m.p.h. approximately ten minutes earlier and was attempting to repeat that feat at a higher rate of speed, 60 m.p.h. – twice the speed recommended for the curve.

{¶ 10} After entering the left-hand curve just past the burn site, Howard lost control of the car. His vehicle yawed across the roadway, traveled up a berm, and vaulted into the air before crashing into a tree near a culvert. Howard died instantly; Butler survived.

{¶ 11} The first police officer to arrive at the accident scene noticed icy conditions on the roadway. He found water running onto the road and noted that it had frozen in some places and had turned slushy in others. Other officers dispatched to the accident scene also observed water, slush, and ice on the roadway, as well as fresh water flowing onto the roadway from the drive to the burn site. For summary judgment purposes, we proceed with the assumption that there was ice on Bear Creek Road and that the ice was the result of water used by the fire department at the burn site.

{¶ 12} After investigating the accident, police concluded, "Stricken with water, rock salt, and some ice, [Christopher] failed to negotiate the left-hand curve, over-corrected, and locked up the brakes. Unable to maintain or regain control, he crossed the center-line, striking a sign post and coming to final rest roof first around a tree."

{¶ 13} The sensing diagnostic module ("SDM") in the air-bag sensor in Christopher's car was recovered after the accident. It confirmed that Christopher had been traveling at a rate of 60 m.p.h. five seconds before the accident.

Although appellee's expert witness and accident reconstructionist, Fred Lickert, agreed that Christopher had attempted to make the turn in Bear Creek Road at a "careless" rate of speed, he concluded that the roadway itself presented a hazardous condition to its ordinary users. Lickert's opinion is that it is possible for a vehicle, under optimal conditions, to negotiate the curve at speeds in excess of 70.9 m.p.h. He concluded that "the actions and inactions of the Miami Township Fire Department in failing to address the hazardous condition of the roadway were a proximate and contributing cause of this fatal accident."

{¶ 14} Appellee brought suit against the appellants, Miami Township and the Miami Township Fire Division, alleging that the township was liable for Christopher's death because Christopher had lost control of his vehicle when it hit "black ice" that had formed on the roadway due to Miami Township's negligence. The township moved for summary judgment, asserting that it was immune from liability by operation of R.C. 2744.02, the Political Subdivision Tort Liability Act. The trial court agreed, concluding that general blanket immunity applies to the township and that no exception to that immunity applies to this case.

{¶ 15} Critical to our analysis is the trial court's finding that the ice on Bear Creek Road did not amount to an "obstruction" as that term is used in R.C. 2744.02(B)(3). The trial court found that the term "obstruction" should be given its ordinary definition—something that "blocks or closes up by obstacle." Because passage through Bear Creek Road had not been blocked by any obstacle, the trial court determined that the water and ice on the road did not amount to an "obstruction" and held that the township was not liable for Christopher's death.

{¶ 16} Howard appealed to the Second District Court of Appeals, which reversed. The court of appeals held that the term "obstruction" should be construed broadly to include any object that has the potential to interfere with the safe passage of motorists on public roads.

{¶ 17} We accepted the township's discretionary appeal, which asserted two related propositions: that an "obstruction" as used in R.C. 2744.02(B)(3) should be given the plain and ordinary meaning of an "obstacle" or "something that blocks or closes up by obstacle," and that a political subdivision's duty extends only to obstacles that block a roadway for usual and ordinary modes of travel.

### Analysis

{¶ 18} Our analysis of whether a township is immune from liability pursuant to R.C. Chapter 2744 is familiar. First, we begin with the understanding that political subdivisions are not liable generally for injury or death to persons in connection with a township's performance of a governmental or proprietary function. R.C. 2744.02(A)(1). Second, we consider whether an exception to that

4

general rule of immunity applies. R.C. 2744.02(B). If an exception does apply, we must determine whether the township can still establish immunity by demonstrating another statutory defense. R.C. 2744.03. The case before us turns on the second prong of the analysis (whether an exception to the general rule applies).

{¶ 19} Pursuant to R.C. 2744.02(B)(3), an exception for immunity exists for injuries or death caused by a township's "negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads." As the trial court recognized, the critical inquiry here is whether the ice on Bear Creek Road was an "obstruction." The legislature did not define that term in the statute, nor have we done so in our prior decisions.

{¶ 20} In interpreting the statute now, we again apply familiar rules. "[W]here the language of a statute is clear and unambiguous, it is the duty of the court to enforce the statute as written, making neither additions to the statute nor subtractions therefrom." *Hubbard v. Canton City School Bd. of Edn.*, 97 Ohio St.3d 451, 2002–Ohio–6718, 780 N.E.2d 543, ¶ 14. "If it is ambiguous, we must then interpret the statute to determine the General Assembly's intent. If it is not ambiguous, then we need not interpret it; we must simply apply it." *State v. Hairston*, 101 Ohio St.3d 308, 2004–Ohio–969, 804 N.E.2d 471, ¶ 13.

{¶ 21} The plain and ordinary meaning of "obstruction" is "1. an obstructing or being obstructed; 2. anything that obstructs; hindrance." Webster's New World Dictionary (1988) 936. "Obstruct" is defined as "1. To block or stop up (a passage) with obstacles or impediments; dam; clog; 2. to hinder (progress, an activity, etc.); impede; 3. to cut off from being seen; block (the view)." Id. If the definition of obstruction meant only to "block or stop" or to dam or clog, there would be no ambiguity and no debate that the ice on Bear Creek Road was not an obstruction, because there is no evidence before us that the road was not passable as a result of the ice. Accord, *Parker v. Upper Arlington*, Franklin App. No. 05AP–695, 2006–Ohio–1649, 2006 WL 832523, at ¶ 14, quoting Webster's Third International Dictionary (1961) 1559 (stop signs, painted crosswalks, and sidewalk ramps are not obstructions because they do not "block up" or present "obstacles or impediments to passing" through the public roadways); *Monroeville v. Wheeling & Lake Erie Ry. Co.*, 152 Ohio App.3d 24, 2003–Ohio–1420, 786 N.E.2d 504, ¶ 17 ("Merriam Webster's Collegiate Dictionary (10th Ed.1996) 803, defines 'obstruct' as follows: 'to block or close up by an obstacle; to hinder from passage, action or operation; to cut off from sight' " and concluding that R.C. 5589.20 and R.C. 5589.21, which prohibit railroads from obstructing a public street or roadway, "require[ ] a complete blockage").

{¶ 22} But the dictionary definitions of obstruction also include the concepts of hindering and impeding—concepts that do not necessarily require a complete

blockage. Seizing that language, and applying opinions of the Ohio Attorney General from 25 years ago—see, e.g., 1980 Ohio Atty.Gen.Ops. No. 80–071, at 2–282—the court of appeals held that " 'obstruction,' as it is used in R.C. 2744.02(B)(3), should be interpreted to mean any object placed or erected in a public roadway that has the potential of interfering with the public's use of that roadway. An interference occurs when the public's safe use of the roadway is jeopardized." *Howard v. Miami Twp. Fire Div.*, 171 Ohio App.3d 184, 2007–Ohio–1508, 870 N.E.2d 197, ¶ 23–24. It then concluded, "[A]n icy mixture on a public roadway has the potential of interfering with the public's safe use of the roadway by creating an opportunity for loss of traction and/or loss of control of a vehicle" and that "the township was not entitled to judgment as a matter of law under R.C. 2744.02(B)(3), because the political subdivision had a duty of care to remove this obstruction from the road." Id. at ¶ 26. We reverse this holding.

{¶ 23} The court of appeals' conclusion ignores what we believe is a critical aspect of the analysis—the statutory history of this subsection.

{¶ 24} The current version of R.C. 2744.02(B)(3) was amended in part by Senate Bill 106 ("S.B. 106"), effective April 2003. Prior to that date, R.C. 2744.02(B)(3) read, "[P]olitical subdivisions are liable for injury, death, or loss to person or property caused by their failure to keep public roads, highways, streets, avenues, alleys, sidewalks, bridges, aqueducts, viaducts, or public grounds within the political subdivisions open, in repair, *and free from nuisance * * *.*" (Emphasis added.) See 149 Ohio Laws, Part II, 3500, 3508.

{¶ 25} Contrary to appellee's counsel's suggestion at oral argument in this case and to the Sixth District's decision in *Floering v. Roller*, Wood App. No. WD–02–076, 2003–Ohio–5679, 2003 WL 22417127, at ¶ 27 (interpreting the current version of R.C. 2744.02(B)(3) as imposing the same duty of care on political subdivisions as it did when the statute's language included "free from nuisance"), we believe that the General Assembly purposely replaced the phrase "free from nuisance" with "other negligent failure to remove obstructions." To find otherwise is to conclude that the legislature's action in amending the statute was a superfluous act.

{¶ 26} We are persuaded that the legislature's action in amending R.C. 2744.02(B)(3) was not whimsy but a deliberate effort to limit political subdivisions' liability for injuries and deaths on their roadways.

{¶ 27} As we noted in *Harp v. Cleveland Hts.* (2000), 87 Ohio St.3d 506, 509, 721 N.E.2d 1020, fn. 1, the General Assembly had attempted previously to make the same amendment to R.C. 2744.02(B)(3) as part of one of its tort-liability-limitation measures, Am.Sub.H.B. No. 350, 146 Ohio Laws, Part II, 3867, 3987, effective January 27, 1997. See *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 458, 715 N.E.2d 1062 (holding that Am.Sub.

H.B. No. 350 was unconstitutional because it violated the separation-of-powers doctrine and the single-subject rule). Indeed, we presume that at the time it enacted Am.Sub.H.B. No. 350, the legislature was aware of judicial decisions interpreting the term "nuisance" broadly to reach an array of acts or omission that endanger life or health. For example, prior to the legislature's passing Am.Sub.H.B. No. 350, we had interpreted former R.C. 2744.02(B)(3)'s use of the term "nuisance" to include "conditions that directly jeopardize the safety of traffic on the highway" even if they did not appear on the roadway itself. *Manufacturer's Natl. Bank of Detroit v. Erie Cty. Road Comm.* (1992), 63 Ohio St.3d 318, 322–323, 587 N.E.2d 819.

{¶ 28} We have adhered to that precedent after *Sheward*, continuing to construe "nuisance" in broad terms. Thus, in *Harp*, 87 Ohio St.3d at 512, 721 N.E.2d 1020, we held that a defective tree limb threatening to fall on a public roadway, but not actually on the roadway, could constitute a nuisance under R.C. 2744.02(B)(3) and that a political subdivision's duty of care extended beyond merely removing obstructions from public roads. Later, in *Sherwin–Williams Co. v. Dayton Freight Lines, Inc.*, 112 Ohio St.3d 52, 2006–Ohio–6498, 858 N.E.2d 324, ¶ 16, we held that a political subdivision could be held liable for injuries sustained outside the political subdivision if the injuries were caused by a nuisance that arose within its territory. In so doing, the majority in *Sherwin–Williams* noted that "the General Assembly is perfectly capable of limiting the reach of a political subdivision's liability to injuries or losses that occur on property within the political subdivision," id. at ¶ 17, and the dissenting justice invited the legislature to clarify the meaning of R.C. 2744.07(B). Id. at ¶ 33 (Lundberg Stratton, J., dissenting).

{¶ 29} Given the General Assembly's prior inclusion of the same language in Am.Sub.H.B. No. 350, our precedent that broadly defines the term "nuisance," and that S.B. 106 also limited the definition of "public roads" from a more expansive reading that included "berms, shoulders, rights-of-way, or traffic control devices" to one that focused solely on the roadway itself, see *Howard*, 171 Ohio App.3d 184, 2007–Ohio–1508, 870 N.E.2d 197, ¶ 17, we discern a legislative intent to limit political-subdivision liability for roadway injuries and deaths. The General Assembly, in furtherance of its goal, used the word "obstructions" in a deliberate effort to impose a condition more demanding than a showing of a "nuisance" in order for a plaintiff to establish an exception to immunity.

{¶ 30} We conclude that for purposes of R.C. 2744.02(B)(3), an "obstruction" must be an obstacle that blocks or clogs the roadway and not merely a thing or condition that hinders or impedes the use of the roadway or that may have the potential to do so. Accordingly, we reverse the judgment of the court of appeals

and reinstate the trial court's order granting summary judgment in favor of appellants.

Judgment reversed.

LUNDBERG STRATTON, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

MOYER, C.J., and PFEIFER, J., dissent.

---

**MOYER, C.J., dissenting.**

{¶ 31} As the majority states, the critical issue in this case is whether ice that has accumulated on a public road can be considered an "obstruction" consistent with the meaning of the term in R.C. 2744.02(B)(3). Because I believe that ice can qualify as such an obstruction, I respectfully dissent.

{¶ 32} R.C. 2744.02(B)(3) provides exceptions to the general concept of political subdivision immunity, stating that "political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure * * * to remove obstructions from public roads * * *." The majority defines "obstruction" as "anything that obstructs" and notes that the definition of "obstruct" is "1. To block or stop up (a passage) with obstacles or impediments; dam; clog; 2. to hinder (progress, an activity, etc.); impede; 3. to cut off from being seen; block (the view)." Webster's New World Dictionary (1988) 936. Under the plain meaning of the second definition of "obstruct," a political subdivision could be liable for its negligent failure to remove an object that hinders or impedes safe travel on the road. Ice that has accumulated on a roadway can certainly have this effect. Because we are duty-bound to follow the plain meaning of statutes as written, I would affirm the judgment of the court of appeals. See *State v. Lowe*, 112 Ohio St.3d 507, 2007–Ohio–606, 861 N.E.2d 512, ¶ 9.

{¶ 33} However, the majority believes that this definition creates ambiguity and refers to the statutory history of the subsection for clarification. Looking to the previous version of the statute, the majority finds that that provision formerly stated that "political subdivisions are liable for injury, death, or loss to person or property caused by their failure to keep public roads * * * open, in repair, and *free from nuisance* * * *." (Emphasis added.) 149 Ohio Laws, Part II, 3500, 3508. The majority acknowledges that our prior cases broadly read "free from nuisance" to include conditions both on and off the public roads. However, it concludes that the General Assembly purposely replaced the phrase "free from nuisance" with "other negligent failure to remove obstructions" so as to limit political subdivision liability to circumstances in which an obstacle blocks or clogs the roadway, as opposed to merely hindering or impeding safe travel on it.

8

{¶ 34} I disagree. Our broad reading of the words "free from nuisance" in prior cases meant that political subdivisions could be liable for the presence of objects outside the actual roadway that altered travel upon the roads. See, e.g., *Manufacturer's Natl. Bank of Detroit v. Erie Cty. Rd. Comm.* (1992), 63 Ohio St.3d 318, 587 N.E.2d 819, paragraph one of the syllabus ("a permanent obstruction to visibility" along a road [here, a cornfield located in the right-of-way] could be a nuisance within the meaning of the statute); *Harp v. Cleveland Hts.* (2000), 87 Ohio St.3d 506, 512, 721 N.E.2d 1020 (a tree limb that hung over and threatened to fall onto a public road could be a nuisance). A political subdivision was therefore liable for failing to remedy a condition outside the roadway even if travel on the road itself remained unhindered.

{¶ 35} The more reasonable interpretation of the new "obstruction" language is that the language is an attempt by the General Assembly to limit political subdivision liability to conditions *on the roadway itself* that *either* block *or* impede safe travel. This interpretation recognizes the majority's argument that the General Assembly purposely changed the language to limit political subdivision liability (by removing liability for conditions existing outside the roadway) and gives full effect to the definition of the terms "obstruction" and "obstruct."

{¶ 36} Reading the statute in this manner also comports with common sense. Under the majority's interpretation of the word "obstruction," Miami Township could be liable if it negligently leaves a large oil drum in one lane of a public road, but not if it negligently leaves a large quantity of oil on the road, because the former would block the road and the latter would not. However, the latter situation would be at least as dangerous as the former. It makes little sense to hold political subdivisions liable for negligence that makes travel impossible while excusing liability for negligence that merely makes travel treacherous. "R.C. 2744.02(B)(3) imposes on political subdivisions a duty of care to keep highways open and safe for public travel," *Manufacturer's Natl. Bank of Detroit,* 63 Ohio St.3d at 321, 587 N.E.2d 819, not just a duty to ensure that traffic flows freely.

{¶ 37} I would therefore affirm the judgment of the court of appeals and hold that ice may be an obstruction for the purposes of R.C. 2744.02(B)(3). I would also remand for further proceedings, holding that defendant-appellant Miami Township may be liable if plaintiff-appellee Donald Howard can demonstrate that the township negligently failed to remove the ice from the road at issue in this case.

PFEIFER, J., concurs in the foregoing opinion.

_____

Dyer, Garofalo, Mann & Schultz, L.P.A., and John A. Smalley, for appellee.

Surdyk, Dowd & Turner Co., L.P.A., Robert J. Surdyk, and Dawn M. Frick, for appellants.

Paul W. Flowers Co., L.P.A., and Paul Flowers; and Gibson & O'Keefe Co., L.P.A., and Stephen P. O'Keefe, urging affirmance for amicus curiae Ohio Association for Justice.