[Cite as *Hopkins v. Porter*, 2014-Ohio-757.]

**IN THE COURT OF APPEALS OF OHIO**
**THIRD APPELLATE DISTRICT**
**MERCER COUNTY**

ANN HOPKINS, INDIVIDUALLY
AND AS EXECUTOR OF THE
ESTATE OF RALPH S. RANLY,
DECEASED,

      PLAINTIFF-APPELLEE/
      CROSS-APPELLANT,              CASE NO. 10-13-17

      v.

DARREN G. PORTER,

      DEFENDANT-APPELLANT/
      CROSS-APPELLEE,
      -and-                   O P I N I O N

MERCER COUNTY COMMISSIONERS'
OFFICE, ET AL.,

      DEFENDANTS-APPELLEES/
      CROSS-APPELLEES.

Appeal from Mercer County Common Pleas Court
Trial Court No. 12-CIV-152

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision: March 3, 2014

APPEARANCES:

    *William P. Lang and Amy B. Ikerd* **for Appellant/Cross-Appellee**

    *Timothy S. Chappars* **for Appellee/Cross-Appellant**

Case No. 10-13-17

**PRESTON, J.**

{¶1} Defendant-appellant/cross-appellee, Darren G. Porter, appeals the judgment of the Mercer County Court of Common Pleas denying him summary-judgment immunity for a motorcycle accident causing the death of Ralph S. Ranly and occurring while Porter, a Mercer County employee, was engaged in a road-improvement project. Plaintiff-appellee/cross-appellant, Ann Hopkins, individually and as executor, appeals the judgment granting the Mercer County Commissioners summary-judgment sovereign immunity for its liability stemming from the motorcycle accident. For the reasons that follow, we affirm the trial court's judgment granting the Mercer County Commissioners sovereign immunity but reverse the trial court's judgment denying Porter summary judgment.

{¶2} Around 1:42 p.m. on a sunny and clear August 16, 2011 afternoon, Porter was operating an Etnyre ChipSpreader[1] (hereinafter "chip spreader") in the course and scope of his employment as a road worker for the county commissioners during a road-improvement project at the intersection of Fort Recovery-Minster Road and St. Peter Road. After Porter finished loading aggregate from a county-owned tri-axle dump truck that was parked in the westbound lane of Fort Recovery-Minster Road, Porter disengaged the chip

---

[1] "Etnyre Chipspreader" is a brand name of a piece of equipment used to distribute aggregate, commonly called "chips," onto freshly sprayed tar in the chip seal road resurfacing process, commonly referred to as "tar and chipping"—a less expensive alternative to asphalt resurfacing. (P's Ex. 4).

-2-

spreader from the hitch of the dump truck, looked east and west for oncoming traffic, and slowly began pulling the chip spreader across the eastbound lane of Fort Recovery-Minster Road to dispense aggregate onto freshly-laid tar on the southbound lane of St. Peter Road. Ranly was operating a 1976 Kawasaki motorcycle eastbound on Fort Recovery-Minster Road about this same time, struck the chip spreader, and was ejected from his motorcycle. Ranly died several weeks later from injuries he sustained during the accident.

{¶3} On August 15, 2012, Hopkins filed a complaint against Porter, the Mercer County Commissioners' Office, each of the county commissioners individually, the Miami Valley Hospital, and the U.S. Department of Health and Human Services for damages Ranly suffered as a result of the accident. (Doc. No. 3).

{¶4} On September 4, 2012, Hopkins voluntarily dismissed the county commissioners—but not the commissioners' office—and the U.S. Department of Health and Human Services. (Doc. Nos. 13-14).

{¶5} On October 9, 2012, Porter and the commissioners filed an answer asserting sovereign immunity under R.C. Chapter 2744. (Doc. No. 16).

{¶6} On December 20, 2012, Porter and the county commissioners filed a joint motion for summary judgment asserting sovereign immunity. (Doc. No. 20).

{¶7} On April 30, 2013, Hopkins filed a memorandum in opposition, arguing that Mercer County was not immune because the chip spreader fell under the motor vehicle exception to immunity, R.C. 2744.02(B)(1), or, alternatively, the chip spreader was an "obstruction" under R.C. 2744.02(B)(3). Hopkins also argued that the county was liable because Porter was reckless. (Doc. No. 38).

{¶8} On May 9, 2013, Hopkins voluntarily dismissed the Miami Valley Hospital. (Doc. No. 51).

{¶9} On August 13, 2013, Judge Ingraham recused himself, and the Supreme Court of Ohio assigned retired Judge Wolff to the case. (Doc. No. 63).

{¶10} On October 2, 2013, the trial court granted Mercer County summary judgment based on sovereign immunity. (Doc. No. 68). However, the trial court found that a material issue of fact existed concerning whether Porter acted recklessly, and therefore, denied summary judgment as to Porter. (*Id.*).

{¶11} On October 4, 2013, Porter filed a notice of appeal. (Doc. No. 69). Thereafter, the trial court certified its judgment as a final, appealable order pursuant to Civ.R. 54(B). (Doc. No. 73). On October 28, 2013, Hopkins filed a notice of cross-appeal. (Doc. No. 74).

{¶12} Porter and Hopkins each raise one assignment of error on appeal. For clarity, we elect to address Hopkins' assignment on cross-appeal first, followed by Porter's assignment of error on appeal.

**Hopkins' Assignment of Error**

**The trial court erred to the prejudice of appellee/cross-appellant by granting summary judgment in favor of cross-appellee Mercer County Commissioner's [sic] Office in finding that the chipspreader was not a "motor vehicle" and that there was not a negligent failure to remove an obstruction.**

{¶13} In her sole assignment of error, Hopkins argues that the trial court erred in granting summary judgment in favor of the Mercer County Commissioners for two reasons. First, Hopkins argues that the chip spreader falls under R.C. 2744.02(B)(1)'s motor-vehicle exception to sovereign immunity. Second and alternatively, Hopkins argues that the chip spreader was an "obstruction" for purposes of R.C. 2744.02(B)(3)'s exception to sovereign immunity.

{¶14} Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Civ.R. 56(C). Our determination of whether summary judgment was appropriate is de novo. *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, ¶ 8.

{¶15} In determining whether a political subdivision is immune from tort liability under R.C. Chapter 2744, courts apply a three-tiered analysis. *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, ¶ 7; *Lambert v. Clancy*, 125 Ohio St.3d 231, 2010-Ohio-1483, ¶ 8. The first tier recognizes R.C. 27044.02(A)(1)'s

general grant of immunity for "damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." *Colbert* at ¶ 7; *Lambert* at ¶ 8.

{¶16} The second tier of the analysis focuses on the five exceptions to political subdivision immunity listed in R.C. 2744.02(B)(1) through (5). *Colbert* at ¶ 8; *Lambert* at ¶ 9. In cases involving the alleged negligent operation of a motor vehicle by an employee of a political subdivision, the second tier of the analysis includes consideration of whether the specific defenses of R.C. 2744.02(B)(1)(a) through (c) apply to negate the immunity exception of R.C. 2744.02(B)(1). *Colbert* at ¶ 8.

{¶17} If any of the R.C. 2744.02(B)(1) through (5) exceptions apply, and if no defense in R.C. 2744.02 applies to negate the liability of the political subdivision under that section, then the third tier of the analysis requires an assessment of whether R.C. 2744.03 reinstates immunity. *Id.* at ¶ 9; *Lambert* at ¶ 9.

### Motor Vehicle Exception

{¶18} The parties do not dispute that the Mercer County Commissioners are a political subdivision for purposes of Chapter 2744. R.C. 2744.01(F); *Ybarra v. Vidra*, 6th Dist. Wood No. WD-04-061, 2005-Ohio-2497, ¶ 8. The dispute in

this case is the applicability of two exceptions to political subdivision immunity provided in R.C. 2744.02(B)(1) and (B)(3). The first of these exceptions, known as the motor-vehicle exception, provides: "[e]xcept as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any *motor vehicle* by their employees when the employees are engaged within the scope of their employment and authority." (Emphasis added) R.C. 2744.02(B)(1). The question presented is whether the chip spreader constitutes a motor vehicle.

{¶19} R.C. 2744.01(E) provides that "motor vehicle" for purposes of the exception to political sovereign immunity in R.C. 2744.01(B)(1) has the same meaning as in R.C. 4511.01. R.C. 4511.01(B)(1) defines motor vehicle, in relevant part, as: "every vehicle propelled or drawn by power * * * except * * * other equipment used in construction work and not designed for or employed in general highway transportation * * *." To determine whether a vehicle falls under the exception in R.C. 4511.01(B)(1), courts apply a "use standard," which requires an examination of the vehicle's actual use at the time of the accident, not its intended or designed use generally. *Muenchenbach v. Preble Cty.*, 91 Ohio St.3d 141, 148 (2001), citing *Putka v. Parma*, 90 Ohio App.3d 647, 651 (8th Dist.1993).

{¶20} "[W]hether a particular vehicle falls within a definition of a 'motor vehicle' is normally a question of law." *Muenchenbach* at 148, fn. 1. Questions

of law are reviewed de novo. *Portage Cty. Bd. of Commrs. v. Akron*, 109 Ohio St.3d 106, 2006-Ohio-954, ¶ 90. De novo review is independent and without deference to the trial court's judgment. *City Rentals, Inc. v. Kesler*, 191 Ohio App.3d 474, 2010-Ohio-6264, ¶ 11 (3d Dist.).

{¶21} Hopkins argues that the chip spreader is a vehicle propelled by power and does not fall under any of the exceptions to the definition of motor vehicle in R.C. 4511.01(B), and therefore, is a motor vehicle for purposes of R.C. 2744.02(B)(1). The commissioners argue that the chip spreader falls under the "other equipment used in construction work and not designed for or employed in general highway transportation" exception in R.C. 4511.01(B), and therefore, is not a motor vehicle for purposes of R.C. 2744.02(B)(1). Hopkins argues that, strictly construing R.C. 4511.01(B), the chip spreader is not used in construction work, because it is not used in "the art, process, or manner of building"—the dictionary definition of "construction"—nor is a chip spreader among the specific examples of exceptions listed in R.C. 4511.01(B). Hopkins also argues that the chip spreader was employed in general highway transportation both before and during the accident.

{¶22} Hopkins argues first that the chip spreader was not a used in "construction" work, because construction is defined as: "the process, art, or manner of building," citing the eleventh edition of Merriam-Webster's Dictionary

(2004). (Cross-appellant's Brief at 21). As Hopkins points out, "construction" is not defined in R.C. 4511.01(B), and therefore, must be given its plain, common, and ordinary meaning and be construed "according to the rules of grammar and common usage." R.C. 1.42; *Smith v. Landfair*, 135 Ohio St.3d 89, 2012-Ohio-5692, ¶ 18.

{¶23} Assuming that Hopkins' definition of construction is appropriate,[2] "build," the base form of the verb from which "building" is derived, is defined as: "to form by ordering and uniting materials by gradual means into a composite whole." *Merriam-Webster's Collegiate Dictionary* 162 (11th Ed.2009). Consequently, even using Hopkins' definition, the chip spreader—used to evenly distribute aggregate ("chips") onto freshly laid tar during road resurfacing—falls under the definition of "build," and therefore, "building," and therefore, "construction." (*See* P's Ex. 4); (Porter Aff., Doc. No. 21). (*See also* Cross-appellant's Brief at 21) (the chip spreader's "ultimate purpose is to lay chips and gravel over a freshly-tarred surface"). Therefore, we reject Hopkins' argument that the chip spreader does not fall under the definition of "construction" as used in R.C. 4511.01(B).

---

[2] There are several more exhaustive definitions of "construction" available. For example, Webster's Third New International Dictionary defines "construction," in relevant part, as: "the act of putting parts together to form a complete integrated object: FABRICATION <during the ~ of the bridge>." 489 (2002). Merriam-Webster's Dictionary Online provides the following: "the act or process of building something (such as a house or road)." Available at http://www.merriam-webster.com/dictionary/construction (accessed Jan. 22, 2014).

{¶24} Hopkins argues secondly that the chip spreader traveled the roadways to arrive at the jobsite and was traveling the roadways—even for a brief moment—at the time of the accident. Therefore, Hopkins argues that the chip spreader was being "employed in general highway transportation" and does not fall under the exception found in R.C. 4511.01(B)(1). Hopkins relies upon two cases for this position: *Muenchenbach v. Preble Cty.* and *Putka v. Parma*, *supra*.

{¶25} The Court of Appeals for the Eighth Appellate District in *Putka* held that a backhoe involved in an accident while being driven from a city garage to a jobsite was a motor vehicle for purposes of R.C. 4511.01(B), and therefore, a motor vehicle for purposes of the exception to political subdivision immunity in R.C. 2744.02(B)(1). 90 Ohio App.3d 647, 652. While the Court in *Putka* acknowledged that a backhoe is generally designed and intended for construction work, the Court found that, at the time of the accident, the backhoe "was being operated on a public road, contrary to its intended purpose and to the purpose for which the exemption was granted." *Id.* at 650-651.

{¶26} The Court in *Putka* reasoned that if the General Assembly had intended to grant a further exemption to backhoes traveling short distances on the roadways, it could have stated so in the statute. *Id.* at 651. The Court continued, "[a]bsent such a grant, a backhoe should only be operated at the site of its intended use. If it is to be operated on city streets for short-distance travelling, then it

should be either drawn or towed to avoid being classified as a 'motor vehicle.'" *Id.* The Court ultimately concluded that a backhoe is not a "motor vehicle" under R.C. 4511.01(B) if it is used for its intended purpose; however, when a backhoe is operated on the public road as any other vehicle, it cannot be exempt as a matter of law from being classified as a "motor vehicle" merely because it traveled a short distance. *Id.* at 652.

{¶27} In *Muenchenbach v. Preble Cty.*, a motorist struck a county-owned Ford tractor, equipped with a street-sweeping brush on the front and a scraper blade on the back, when the tractor made a sudden left turn into a private drive as the motorist attempted to pass the tractor on the left. 91 Ohio St.3d 141, 142. The trial court and the appellate courts both found that the tractor was not a motor vehicle for purposes of R.C. 4511.01(B), because it was construction equipment. *Id.* While the trial court and appellate courts both found *Putka* logically sound and relevant, the lower courts distinguished the case from *Putka*, because, at the time of the accident, the tractor was being used in construction work in a construction zone. *Id.* at 144.

{¶28} The Supreme Court of Ohio agreed that the "use standard" developed in *Putka* was appropriate for determining whether a vehicle is exempted under the definition of motor vehicle in R.C. 4511.01(B) on the basis that it constitutes "other equipment used in construction work and not designed for or employed in

-11-

general highway transportation." *Id.* at 148. According to the Court, whether a vehicle falls under this exception is generally a question of law; however, in this case, there was a question of fact whether the tractor was being used in construction work at the time of the accident. *Id.* at 145, 148, fn.1. The affidavits of the parties conflicted concerning the reason or reasons the tractor turned around in the private drive. *Id.* The county and county's employee averred the tractor was turned around to pack down freshly dumped gravel; whereas, the appellants-motorists averred that the county employee admitted that he turned the tractor around to warm up in a county vehicle and there was no freshly dumped gravel on the jobsite. *Id.* There were also questions of fact concerning the use of a slow-moving vehicle sign and flashing lights on the tractor. *Id.*

{¶29} Hopkins argues that the chip spreader was employed in general highway transportation when it was hauling the aggregate from the back of the dump truck across the eastbound lane of Fort Recovery-Minster Road to St. Peter Road where it was to dispense the aggregate on freshly laid tar. To support this argument, Hopkins relies on *Putka*. *Putka* does not stand for the position Hopkins' advocates, and this case is distinguishable. Although the chip spreader, like the backhoe in *Putka*, was driven on the public roadway to the jobsite, the accident in this case did not occur while the chip spreader was en route to the

jobsite like the accident with the backhoe in *Putka*. (Porter Depo. at 124, 147-148); (Leininger Depo. at 27, 60); (Borns Depo. at 10-11).

{¶30} The accident here occurred within the bounds of a work zone,[3] a type of temporary traffic control ("TTC") zone.[4] Ohio Manual of Uniform Traffic Control Devices ("OMUTCD"), Sections 1A.13-96 and 6C.02 (2005 Ed.). At the time of the accident, the chip spreader was being operated between two tri-axle dump trucks parked along the westbound lane of Fort Recovery-Minster Road. Both dump trucks had four-way hazard lights and two strobe lights in operation when the accident occurred. (Borns Depo. at 14, 24-25); (Leininger Depo. at 56, 59, 61-62); (Porter Depo. at 72, 85); (Porter Aff., Doc. No. 21); (Borns Aff., Doc. No. 22). Consequently, the chip spreader, unlike the backhoe in *Putka*, was being operated within the bounds of a TTC zone when the accident occurred.[5]

---

[3] A work zone "is an area of a highway with construction * * * typically marked by signs, channeling devices, barriers, pavement markings, and/or work vehicles. It extends from the first warning sign or high-intensity rotating, flashing, oscillating, or strobe lights on a vehicle to the END ROAD WORK sign or the last TTC device." Ohio Manual of Uniform Traffic Control Devices ("OMUTCD"), Section 6C.02.

[4] A temporary traffic control zone is defined as: "an area of a highway where road user conditions are changed because of a work zone or incident by the use of temporary traffic control devices, flaggers, uniformed law enforcement officers, or other authorized personnel." OMUTCD, Section 1A.13-96. The OMUTCD was adopted by the Ohio Department of Transportation pursuant to R.C. 4511.09 and is binding on local authorities by virtue of R.C. 4511.11. *Winwood v. Dayton*, 37 Ohio St.3d 282, 284 (1988). Although the OMUTCD was amended in 2012, the accident occurred when the 2005 version was in effect, so our citations to the OMUTCD are to the 2005 version.

[5] The construction work at the intersection was divided into two TTC zones—one TTC zone of short duration in between the two tri-axle dump trucks where the chip spreader was loading aggregate, and a short-term stationary TTC zone extending from the intersection of Fort Recovery-Minster Road and St. Peter Road to the intersection of St. Peter Road and Sharpsburg Road, where the road resurfacing was taking place. OMUTCD Sections 6C.02, 6G.02.

**{¶31}** We decline to expand *Putka* to hold that, for the brief moment the chip spreader was hauling aggregate stone across the eastbound lane of Fort Recovery-Minster Road to St. Peter Road, the chip spreader was "employed in general highway transportation." That defies common sense and practice. Accepting Hopkins' argument would lead to absurd results. For example, accepting Hopkins' argument regarding the chip spreader here would lead to categorizing a backhoe hauling a scoop of material within a work zone as "employed in general highway transportation" because a dump truck could have been utilized. Reasonable minds, employing common sense, can only conclude that the chip spreader was engaged in construction work while moving aggregate within the work zone.

**{¶32}** This case is also distinguishable from *Muenchenbach* wherein the Court found a question of fact concerning whether the tractor was being used in construction work at the time of the accident. Unlike the possible personal reason expressed by the tractor driver in *Muenchenbach* for turning the tractor around in a private drive, Porter's purpose for driving the chip spreader across Fort Recovery-Minster Road—to spread aggregate on freshly laid tar on St. Peter Road—is a distinctly construction-type purpose. Furthermore, in this case there are no questions of fact concerning the use of safety devices on the chip spreader—it was equipped with a slow moving vehicle sign, activated four-way hazard lights, and

an activated strobe light. (P's Joint Ex. 38); (Porter Aff., Doc. No. 21); (Porter Depo. at 76); (Borns Depo. at 27). (*See also* Leininger Depo. at 59, 62).

{¶33} Hopkins further asserts that the commissioners conceded that the chip spreader was a motor vehicle in their motion for summary judgment by citing R.C. 4511.213(A)(2) in their discussion regarding whether the chip spreader was an obstruction. We disagree. First, the discussion of this statute was in regard to the term "obstruction" in R.C. 2744.02(B)(3), not motor vehicle in R.C. 2744.02(B)(1). Secondly, once Hopkins pointed this "concession" out in her memorandum in opposition to summary judgment, the commissioners quickly refuted any implication of a concession on this issue. (Doc. Nos. 38, 53).

{¶34} Because the chip spreader was not being used as a motor vehicle under the undisputed facts of this case, the trial court did not err in granting the commissioners summary judgment on the R.C. 2744.02(B)(1) exception to political subdivision sovereign immunity.

### Obstruction

{¶35} The second issue of law raised by Hopkins' cross-appeal is whether the trial court erred by concluding that the chip spreader was not an obstruction in the roadway for purposes of R.C. 2744.02(B)(3)'s exception to political subdivision sovereign immunity.

**{¶36}** "[P]olitical subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads * * *." R.C. 2744.02(B)(3). An obstruction under the statute is "an obstacle that blocks or clogs the roadway and not merely a thing or condition that hinders or impedes the use of the roadway or that may have the potential to do so." *Howard v. Miami Twp. Fire Div.*, 119 Ohio St.3d 1, 2008-Ohio-2792, ¶ 30.

**{¶37}** In *Howard*, the Court determined that ice on a roadway formed from run-off water from a training exercise the Miami Township Fire Division conducted was not an "obstruction" under the statute. 2008-Ohio-2792, at ¶ 30. This Court, relying on *Howard*, concluded that a seven to eight-foot-long wooden crossbeam that was covering one-third of a roadway was not an obstruction. *McNamara v. Marion Popcorn Festival*, 3d Dist. Marion No. 9-12-34, 2012-Ohio-5578, ¶ 26.

**{¶38}** Hopkins argues that, by blocking the entire eastbound lane, the chip spreader, unlike the crossbeam in *McNamara*, constituted an obstruction under the statute. The trial court rejected Hopkins' argument, citing *Widen v. Pike Cty.* for the proposition that "the General Assembly intended for the obstruction to already exist in the roadway." (Oct. 2, 2013 JE, Doc. No. 68); 187 Ohio App.3d 510, 2010-Ohio-2169, ¶ 23-24 (4th Dist.). We agree with the trial court that the alleged

obstruction in this case is categorically different than the alleged obstructions in *McNamara* and *Howard*. The alleged obstructions in *McNamara* (a wooden crossbeam) and *Howard* (ice) were objects or conditions in the road existing prior to the accidents occurring. Here, the alleged obstruction (a chip spreader) was a moving object that became an "obstruction" simultaneous with the accident.

{¶39} Contrary to Hopkins' arguments otherwise, the chip spreader is analogous to the oncoming vehicle that caused the accident in *Widen v. Pike Cty.* In that case, a sheriff's deputy, directing traffic for a funeral procession, motioned vehicles in the decedent's lane of travel into an intersection where the decedent was struck by an oncoming vehicle. 2010-Ohio-2169, at ¶ 1-4. The decedent's estate sued Pike County arguing, in relevant part, that the oncoming vehicle was an obstruction under R.C. 2744.02(B)(3)'s exception to political subdivision sovereign immunity. *Id.* at ¶ 15. While acknowledging that the oncoming vehicle fell within *Howard*'s general definition of "obstruction," the appellate court concluded that, by using the phrase "*remove* obstructions from the public roads," the General Assembly intended the obstruction to already exist in the roadway. (Emphasis added). *Id.* at ¶ 23. The Court in *Widen* concluded that since the oncoming vehicle was not already in place at the time of the accident—but in the intersection simultaneously with decedent's vehicle—the deputy could not have

been negligent by failing to remove the oncoming vehicle from the intersection. *Id.* at ¶ 26.

{¶40} Similarly, the Court of Appeals for the Eighth Appellate District determined that a tree limb, which fell into a roadway causing a motorcycle accident was not an obstruction under R.C. 2744.02(B)(3). *Estate of Finley v. Cleveland Metroparks*, 189 Ohio App.3d 139, 2010-Ohio-4013, ¶ 3, 41. Like the oncoming vehicle in *Widen* and the chip spreader here, the tree limb was a moving obstruction, which fell into the street as the motorcyclist was driving down the road, causing the accident. *Id.* at ¶ 3.

{¶41} The Court in *Finley* observed that, even under the prior version of R.C. 2744.02(B)(3)—which subjected political subdivisions to greater potential liability—liability was not imposed absent evidence that the political subdivision had actual or constructive knowledge of the nuisance. *Id.* at ¶ 36-37. The Court in *Finley*, like the Court in *Howard*, observed that, by amending R.C. 2744.02(B)(3) to use the term "obstruction," the General Assembly intended to impose a condition *more demanding* than a mere showing of a "nuisance." *Id.* at ¶ 39.

{¶42} Based upon the aforementioned, the Court in *Finley* concluded that "[a]lthough there is little debate that the fallen tree in this case became an obstruction in the roadway when it fell, we find that the Metroparks must have had either actual or constructive knowledge of the obstruction before liability can be

imposed." *Id.* at ¶ 41. Because there was no evidence that the Metroparks had notice of the fallen tree limb, the Court concluded that the exception to immunity did not apply. *Id.* In a footnote to its holding, the Court recognized the implication of its holding—an implication that the Court in *Widen* previously recognized and this Court recognizes in this case:

> We are cognizant of the fact that the amendment of R.C. 2744.02(B)(3) from "nuisance" to "obstruction" means that a political subdivision will probably never be found to be on notice of an obstruction that occurs simultaneously with an accident, thereby making it impossible for a plaintiff to recover in these types of situations. As the Ohio Supreme Court noted in *Howard*, 119 Ohio St.3d 1, 2008-Ohio-2792, 891 N.E.2d 311, ¶ 26, "the legislature's action in amending R.C. 2744.02(B)(3) was not whimsy but a deliberate effort to limit political subdivisions' liability for injuries and deaths on their roadways."

*Id.* at ¶ 41, fn. 4.

{¶43} We agree with the Courts' interpretation of R.C. 2744.02(B)(3) in *Widen* and *Finley*. To find a political subdivision liable for its "negligent failure to *remove* obstructions," the obstruction must already exist in the roadway prior to the accident—the obstruction cannot occur simultaneous with the occurrence of

the accident. Here, the chip spreader became an obstruction simultaneous with the occurrence of the accident. There was no opportunity for the county to remove the chip spreader prior to the accident, and therefore, the county cannot be negligent for failing to remove the chip spreader as a matter of law.

{¶44} This interpretation is not only consistent with the statutory language but also the General Assembly's intent by amending R.C. 2744.02(B)(3) to limit political subdivision sovereign immunity. *Howard*, 2008-Ohio-2792, at ¶ 26. Even prior to the more restrictive version of R.C. 2744.02(B)(3), the plaintiff was required to show that the political subdivision had notice and an opportunity to cure the "nuisance"—the operative word under the prior version of the statute— before courts would impose liability. *Vogel v. Wells*, 57 Ohio St.3d 91, 97 (1991). The notice-and-an-opportunity-to-cure requirement can only work if the obstruction exists in the roadway prior to the accident. Furthermore, by bootstrapping the chip spreader to "obstruction" in R.C. 2744.02(B)(3), the plaintiff essentially expands political subdivision liability under R.C. 2744.02(B)(1) for a type of vehicle that the General Assembly did not intend.

{¶45} Because we have determined that the county cannot be liable for failing to remove the chip spreader under R.C. 2744.02(B)(3) because the chip spreader was not already in the roadway prior to the accident, it does not matter whether, as an issue of fact, the chip spreader was totally blocking the eastbound

lane of Fort Recovery Road or whether the chip spreader had just crossed the center line when the accident occurred. Therefore, summary judgment was not foreclosed by this potential question of fact.

{¶46} For all the aforementioned reasons, the trial court did not err by concluding that the county commissioners were entitled to judgment as a matter of law under R.C. 2744.02(B)(3).

{¶47} Because the trial court did not err by granting the county commissioners summary judgment under R.C. 2744.02(B)(1) and (B)(3), we overrule Hopkins' assignment of error on cross-appeal and affirm the trial court's judgment on these issues.

### Porter's Assignment of Error

**The trial court erred when it held there was a genuine issue of material fact depriving Darren Porter of immunity granted by Revised Code Section 2744.03(A)(6).**

{¶48} In his sole assignment of error, Porter argues that the trial court erred by finding an issue of fact concerning whether he acted recklessly and, thereby, denying him summary judgment. Porter argues that the record fails to establish reckless conduct as a matter of law. We agree.

{¶49} R.C. 2744.03(A)(6)(b) provides, in relevant part, that: "the employee is immune from liability unless * * * [t]he employee's acts or omissions were * * * in a wanton or reckless manner[.]"

-21-

{¶50} For purposes of R.C. 2744.03(A)(6), the Supreme Court of Ohio has defined "reckless" as: "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, ¶ 34, relying on *Thompson v. McNeill*, 53 Ohio St.3d 102, 104-105 (1990). *See also O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, ¶ 73, citing *Thompson*, *supra*. In *Thompson*, the Ohio Supreme Court favorably quoted the following definition of reckless:

> "The actor's conduct is in reckless disregard of the safety of others if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." 2 Restatement of the Law 2d, Torts (1965), at 587, Section 500.

53 Ohio St.3d at 104-105. Although recklessness is generally a jury question, the standard for showing recklessness is high, so summary judgment is appropriate where the record is devoid of evidence showing such conduct. *O'Toole*, 2008-

Ohio-2574, at ¶ 75, citing *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356 (1994).

{¶51} The circumstances leading up to the accident in this case are undisputed as to material issues of fact. During the early afternoon on a sunny and clear day in August 2011, Mercer County road workers were dispatched to the intersection of Fort Recovery-Minster Road and St. Peter Road to resurface St. Peter Road after finishing another resurfacing project in the area. (Porter Depo. at 56, 64-65, 98, 114); (Borns Depo. at 10-12, 24). Porter drove the chip spreader from the prior jobsite to the northern part of St. Peter Road, where he waited for Borns to arrive with a tri-axle load of aggregate. (Porter Depo. at 64-69).

{¶52} Borns arrived shortly later and parked the tri-axle truckload of aggregate just west of the intersection in the westbound lane of Fort Recovery-Minster Road. Porter hitched the chip spreader to the back of the truck to load aggregate. (Porter Depo. at 67); (Borns Depo. at 22-23). Borns lifted the bed of the truck dumping aggregate into the chip spreader until Porter indicated it was full, at which point Porter indicated to Borns that he could lower the bed of the truck. (Porter Depo. at 69). After the truck bed was down, Porter disengaged the chip spreader from the truck hitch, pulled the chip spreader away from the back of the truck, and prepared to turn the chip spreader southbound from behind the truck

toward St. Peter Road to begin spreading aggregate on freshly laid tar. (Porter Depo. at 90-93, 127); (Borns Depo. at 29).

{¶53} Before turning toward St. Peter Road, Porter looked both ways down Fort Recovery-Minster Road to see if there was any traffic, but did not see anything. (Porter Depo. at 92, 96-97, 127). As Porter was starting to turn into the eastbound lane of Fort Recovery-Minster Road, Borns looked out the window of his truck and saw a motorcycle, driven by the decedent, approaching. (Borns Depo. at 29). Borns yelled "motorcycle" into his two-way radio, at which point Porter immediately tried to back up the chip spreader, but the motorcycle struck the front, right corner of the chip spreader, causing fatal injuries to the motorcycle driver. (Porter Depo. at 61, 87-89, 94, 103, 105, 139); (Borns Depo. at 29-33); (Joint Exs. 4-5, 7, 40-45).

{¶54} Porter had been at the jobsite only a few minutes prior to the accident and loading the aggregate took approximately five minutes. (Porter Depo. at 65, 70); (Borns Depo. at 26). The four-way flashers and the strobe light were activated on the chip spreader at the time of the accident. (Porter Depo. at 74-77, 152); (Borns Depo. at 27). (*See also* Leininger Depo. at 62). The chip spreader was also equipped with a slow-moving vehicle sign. (Porter Depo. at 125); (Joint Exs. 11-14, 18, 38). Porter estimated his speed to be one mile per hour at the time of the accident. (Porter Depo. at 99).

**{¶55}** At the time of the accident, two large, red tri-axle dump trucks were parked in the westbound lane of Fort Recovery-Minster Road with their four-way flashers and strobe lights activated—Born's truck was west of the southern part of St. Peter Road, and another truck was east of the northern part of St. Peter Road. (Borns Depo. at 14-18, 24-25); (P's Ex. 11); (Leininger Depo. at 59, 61-62). Two additional dump trucks were parked in the southbound lane on the northern part of St. Peter Road, near the intersection. (Borns Depo. at 14-18); (P's Ex. 11).

**{¶56}** Porter argues that he did not act recklessly as a matter of law, and therefore, the trial court erred by denying him summary judgment. In particular, Porter argues that he activated the strobe light and the four-way hazard lights on the chip spreader in order to alert traffic of the temporary work zone; he had a functioning two-way radio for communication; he looked both ways before attempting his turn; he was operating the large, yellow chip spreader extremely slowly; the work zone conformed to Mercer County policies and procedures as well as OMUTCD requirements; and, he immediately stopped the chip spreader after hearing "motorcycle" over the two-way radio. We agree that Porter did not act recklessly.

**{¶57}** Hopkins points to two issues to show Porter was reckless: first, Porter's failure to "look effectively" for oncoming traffic; and second, to the lack of safety warnings for oncoming traffic. Both fail to raise an issue of fact as to

whether Porter was reckless. Porter testified repeatedly that he looked prior to turning the chip spreader into Fort Recovery-Minster Road. The following is just one example of an exchange between Porter and Hopkins' counsel on this issue:

Q: Okay. * * * I thought I heard you use the word look. What did you look at?

A: To see if I saw anything coming.

Q: Where did you look?

A: Both ways.

Q: Okay. Tell me about that.

A: I looked to the left, looked to the right. I mean, usually I look both ways twice but I don't know for sure at that instant. I looked, didn't see anything.

* * *

Q: Sir, there was broad daylight on August 16th. I mean, was it sunny out?

A: Yes.

Q: A clear day?

A: Yes.

Q: You weren't blinded by the sun when this happened were you?

A: No.

(Porter Depo. at 92, 98). When asked why he failed to see the motorcycle, Porter testified, "I don't know. I didn't see it. I have no idea. Like I said, I saw him the last second." (*Id.* at 97).

{¶58} At the time of the accident, Porter was seated in an elevated position on the southeast corner of the chip spreader nearest to the center dividing line of Fort Recovery-Minster Road; in other words, the best possible place on the chip spreader for Porter to see around the dump truck to look for eastbound traffic. Prior to moving the chip spreader, Porter instructed Borns to lower the bed of the truck, which would have only improved Porter's visibility around the truck and the visibility of the chip spreader to oncoming traffic. No testimony was introduced showing that the truck or anything else obstructed Porter's vision of eastbound traffic. Finally, Porter looked both ways and slowly began to turn across Fort Recovery-Minster Road. No evidence was presented that Porter failed to look or that he quickly pulled away from the truck. At the time of the accident, the chip spreader was equipped with a slow-moving vehicle sign, a functioning strobe light, and functioning four-way hazard lights.

{¶59} Hopkins' own expert witness never opined that Porter failed to look before turning the chip spreader—only that "if Porter had *looked effectively* the motorcycle should have been readily visible," and the accident was caused by Porter "*failing to look effectively*, changing lanes without first making sure he

could do so safely." (Emphasis added). (Heard Aff., Doc. No. 40). Failing to "look effectively" for traffic, while perhaps negligent, is not reckless. *See* 1 *Ohio Jury Instructions*, CV Section 401.05 (Rev. Dec. 12, 2012). ("A person is negligent if he/she looks but does not see that which would have been seen by a reasonably (cautious) (careful) (prudent) person under the same or similar circumstances."). As Hopkins acknowledges, Porter failed to yield the right-of-way, which amounts to negligence, not recklessness on Porter's part. (Cross-appellant's Brief at 13). *See Coronet Ins. v. Richards*, 76 Ohio App.3d 578, 585 (10th Dist.1991) (violating R.C. 4511.39 is negligence *per se*).

**{¶60}** Next, Hopkins argues that Porter's conduct was reckless because the county failed to use warning signs required by the Ohio Manual of Uniform Traffic Control Devices ("OMUTCD"). There are two deficiencies with this argument. First, Porter was the chip spreader operator and was not responsible for warning signs—that was the responsibility of the supervisor, and ultimately the county engineer. (Leininger Depo. at 8, 23, 27-29); R.C. 5543.01. Neither the supervisor nor the county engineer is a party. Even assuming that the safety precautions taken by the county failed to meet OMUTCD requirements, no evidence was presented to show that Porter *knew* this fact. For his part, Porter used all of the warning signals available to him, including a slow-moving vehicle sign, four-way hazard lights, and a strobe light.

{¶61} The second deficiency with this argument is its underlying premise that the work zone failed to comply with the OMUTCD. Robert R. Reed, Hopkins' expert witness on the OMUTCD,[6] opined that Mercer County personnel violated the OMUTCD, because the four-way hazard warning lights of the dump truck, along with its beacon, did not provide Ranly proper warning of the impending danger. (Doc. No. 41). The plain language of the OMUTCD, however, refutes this opinion, and compliance with the OMUTCD is an issue of law we can determine. *Shope v. Portsmouth*, 4th Dist. Scioto No. 11CA3459, 2012-Ohio-1605, ¶ 20-21.

{¶62} "A TTC zone is an area of a highway where road user conditions are changed because of a work zone or an incident through the use of TTC devices, uniformed law enforcement officers, or other authorized personnel." OMUTCD, Section 6C.02. A work zone is a particular type of TTC zone and defined as follows:

> A work zone is an area of a highway with construction, maintenance, or utility work activities. A work zone is typically marked by signs, channelizing devices, barriers, pavement markings, *and/or work vehicles.* It extends from the first warning sign or high-intensity

---

[6] Mercer County objected to Reed's affidavit pursuant to Evid.R. 702. (Doc. No. 53). The trial court never ruled on this interlocutory motion, however, so it is presumed to be overruled. *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 223 (1994).

> rotating, flashing, oscillating, or strobe lights *on a vehicle* to the
>
> END ROAD WORK sign *or the last TTC device.*

(Emphasis added). *Id.* Based on this definition and the record, the construction work at the intersection of Fort Recovery-Minster Road and St. Peter Road was divided into two work zones: one work zone between the two tri-axle dump trucks equipped with strobe lights where the chip spreader was loading aggregate, and one work zone extending the length of St. Peter Road in between the two road closed signs, where the road resurfacing project was taking place. OMUTCD Sections 6C.02, 6G.02.

{¶63} As section 6G.01 of the OMUTCD indicates:

> Each TTC zone is different. Many variables, such as location of work, highway type, geometrics, vertical and horizontal alignment, intersections, interchanges, road user volumes, road vehicle mix (buses, trucks, and cars), and road user speeds affect the needs of each zone. The goal of TTC in work zones is safety with minimum disruption to road users. The key factor in promoting TTC zone safety is proper judgment.

The requirements for each TTC zone depend, principally, on the work duration, work location, work type, and highway type. OMUTCD, Section 6G.01.

**{¶64}** The manual provides five categories of work duration, each with specified, required, and recommended safety requirements. Work zones of "short duration," require work that occupies up to one hour. *Id.* Loading the chip spreader took approximately five minutes, and therefore, falls under the short-duration work category. (Porter Depo. at 65, 70); (Borns Depo. at 26). Once the chip spreader was loaded, it was to dispense aggregate on the first fifteen feet of St. Peter Road, and the tri-axle dump truck was to be hitched to the chip spreader and pulled behind the chip spreader as it continued to dispense aggregate. (Porter Depo. at 68, 70, 114); (Borns Depo. at 21-22). This is the standard procedure for starting "T-shaped" intersections like the one here, because there is insufficient space in the intersection to hitch the dump truck and chip spreader to begin the resurfacing process. (Borns Depo. at 12, 21-22); (Leininger Depo. at 33-37).

**{¶65}** For work zones of short duration, the OMUTCD provides the following guidance:

> During short-duration work, it often takes longer to set up and remove the TTC zone than to perform the work. Workers face hazards in setting up and taking down the TTC zone. Also, since the work time is short, delays affecting road users are significantly increased when additional devices are installed and removed.

Option: Considering these factors, simplified control procedures may be warranted for short-duration work. A reduction in the number of devices may be offset by the use of other more dominant devices such as high-intensity rotating, flashing, oscillating, or strobe lights on work vehicles.

OMUTCD, Section 6G.02. Consequently, the OMUTCD authorizes the use of strobe lights on work vehicles for work zones of short duration like the one at issue in this case. Significantly, the OMUTCD does not mandate flagmen or a road sign for a work zone of short duration as Hopkins argues.

{¶66} The record in this case also demonstrates that Mercer County personnel considered driver safety for the road resurfacing project, contrary to Hopkins' allegations otherwise. Leininger placed road closed signs and cones on St. Peter Road, where the resurfacing was actually taking place. (Leininger Depo. at 27-29); (Wiechart Depo. at 44); (Joint Exs. 11, 36). Leininger testified that the crew began resurfacing at the intersection of St. Peter Road and Fort Recovery-Minister Road instead of St. Peter Road and Sharpsburg Road (the other end of St. Peter Road), because Sharpsburg Road runs on an angle and there is a curve in the road just to the west of the intersection, decreasing driver visibility. (Leininger Depo. at 64). Viewing the photographs of the scene, it is apparent that drivers approaching the work zone from the west on Fort Recovery-Minster Road had a

significant distance of open road to see the dump trucks—large, red tri-axles equipped with dual strobe lights and four-way flashers. (Joint Exs. 24-26, 64). Drivers approaching the work zone in the westbound lane of Fort Recovery-Minster Road would have seen the other dump truck parked in the lane of travel with its lights activated.

{¶67} The road resurfacing was conducted during the middle of a sunny and clear day in August when visibility would be high. In addition to being in conformity with the OMUTCD, all of the employees, as well as the County Engineer, testified that the chip spreader was loaded in accordance with the county's normal operating procedures. No evidence was presented to suggest that Porter, or any other county employee, did anything out-of-the-ordinary causing the accident.

{¶68} In sum, this was an unfortunate accident resulting from Porter's failure to yield to a motorcyclist. Porter and other crew members took numerous precautions to avoid the accident, but it happened, nonetheless. Considering the entire record, we are persuaded that Porter was not reckless as a matter of law. Therefore, the trial court erred by denying Porter summary judgment under R.C. 2744.03(A)(6).

{¶69} Porter's assignment of error is, therefore, sustained.

{¶70} Because the trial court correctly concluded that the chip spreader was not a "motor vehicle" or an "obstruction" for purposes of R.C. 2744.02(B)(1) and (B)(3)'s exceptions to political subdivision sovereign immunity, respectively, the trial court's grant of summary judgment in favor of the Mercer County Commissioners is affirmed. However, because the trial court erred by finding a question of fact concerning whether Porter was reckless, thereby depriving him of immunity under R.C. 2744.03(A)(6), the trial court's decision denying Porter summary judgment is reversed. This matter is remanded to the trial court for further proceedings consistent with our opinion herein.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**WILLAMOWSKI, P.J., concurs in Judgment Only.**
**SHAW, J., concurs in Judgment Only.**

**/jlr**